Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
Thomas E. Loeser (SBN 202724)
Robert F. Lopez (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
robf@hbsslaw.com

*Attorneys for Plaintiffs and
the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DEAN SHEIKH, JOHN KELNER, and TOM MILONE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC., a Delaware corporation,<br><br>Defendant. | No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF STATE CONSUMER FRAUD ACTS, FRAUD BY CONCEALMENT, AND UNJUST ENRICHMENT<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION .....................................................................................................2

III.   VENUE...................................................................................................................3

IV.    PARTIES ................................................................................................................3

    A.     Colorado Plaintiff ......................................................................................3

    B.     Florida Plaintiff .........................................................................................4

    C.     New Jersey Plaintiff ..................................................................................4

    D.     Defendant ...................................................................................................5

V.     FACTUAL ALLEGATIONS .................................................................................6

    A.     Tesla's Marketing and Sale of Vaporware ................................................6

        1.     Standard Safety Features ................................................................6

        2.     New Hardware and Software..........................................................6

    B.     Real-World Performance ...........................................................................10

        1.     Generally .......................................................................................10

        2.     Plaintiffs' Experiences..................................................................13

            a.     Colorado Plaintiff Dean Sheikh..........................................13

            b.     Florida Plaintiff John Kelner ...............................................16

            c.     New Jersey Plaintiff Tom Milone ........................................18

    C.     Tesla's Violation of the Motor Vehicle Safety Act...................................20

    D.     Tesla's False Advertising and Fraudulent Misrepresentations...................20

VI.    CLASS ALLEGATIONS .......................................................................................21

VII.   VIOLATIONS ALLEGED .....................................................................................25

    A.     Colorado ....................................................................................................25

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
    (COLO. REV. STAT. § 6-1-101, *ET SEQ.*).........................................................25

COUNT II  FRAUD BY CONCEALMENT .......................................................................28

COUNT V  UNJUST ENRICHMENT ..................................................................30

      B.    Florida..........................................................................................31

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES
      ACT (FLA. STAT. § 501.201, *ET SEQ.*) ..............................................31

COUNT II  FRAUD BY CONCEALMENT ..........................................................34

COUNT IV  UNJUST ENRICHMENT ................................................................36

      C.    New Jersey....................................................................................37

NEW JERSEY COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD
      ACT (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*) ........................................37

REQUEST FOR RELIEF....................................................................................40

DEMAND FOR JURY TRIAL ...........................................................................41

I.      INTRODUCTION

1.      Tesla represents on its website that its "Model S is designed from the ground up to be the safest, most exhilarating sedan on the road.  Model S comes with Autopilot capabilities designed to make your highway driving not only safer, but stress free."[1]  But most of its "Standard Safety Features" remain inoperative months after customers have taken delivery, and the Enhanced Autopilot capabilities that consumers paid $5,000 extra to obtain are anything but "safer" and "stress free"—many owners report the Autopilot is essentially unusable and demonstrably dangerous.

2.      Regarding its Standard Safety Features, Tesla told purchasers:  "These active safety technologies, including collision avoidance and automatic emergency braking, will become available in December 2016 and roll out through over-the-air software updates."  When Tesla missed that deadline, it changed its website to state:  "These active safety technologies, including collision avoidance and automatic emergency braking, have begun rolling out through over-the-air updates."  But neither statement was or is accurate.  The Standard Safety Features were not available in December 2016; and in the months since customers have been taking deliveries of cars under these promises, only (1) a dangerously defective Traffic Aware Cruise Control ("TACC"); and (2) a limited front collision warning (with no auto-braking) have actually rolled out.  The remaining features—which are standard on many cars costing less than half the cost of a new Tesla—are absent.

3.      Tesla initially promised that the Enhanced Autopilot software was "expected to complete validation and be rolled out to your car via an over-the-air update in December 2016, subject to regulatory approval."  It missed this delivery date as well.  So then it changed its website to state:  "Tesla's Enhanced Autopilot software has begun rolling out and features will continue to be introduced as validation is completed[,]" leaving the impression that only "validation" and "regulatory approval" were needed.  But what Tesla has delivered to date does not resemble what it promised.  Rather than deliver safe and advanced autopilot features, Tesla has delivered software that causes vehicles to behave erratically.  Contrary to what Tesla represented to them, buyers of affected

---

[1] Tesla Models webpage, https://www.tesla.com/models (last visited Apr. 19, 2017).

1    vehicles have become beta testers of half-baked software that renders Tesla vehicles dangerous if

2    engaged.

3            4.      Tesla's deception has resulted in economic injury to owners of its 2016-17 models

4    that were sold with the hardware ("HW2") purportedly required for Enhanced Auto Pilot (the

5    "Affected Vehicles").  By selling vehicles with inoperative Standard Safety Features and inoperative

6    Autopilot, Tesla defrauded its customers and engaged in unfair competition.  Customers did not

7    receive the benefit of their bargain—they paid many thousands of dollars for a product they did not

8    receive.  Further, consumers such as Plaintiffs would never have bought their Tesla vehicles at all, or

9    would have paid thousands less for them, but for the promised Standard Safety Features the cars

10   were supposed to come with, and Enhanced Autopilot capabilities consumers could supposedly

11   activate in short order by purchasing Tesla's software.

12           5.      Plaintiffs bring this action individually and on behalf of all others similarly situated

13   who leased or purchased the Affected Vehicles.  Plaintiffs seek damages, injunctive relief, and

14   equitable relief for the conduct of Tesla related to the defective Standard Safety Features and

15   Enhanced Autopilot, as alleged in this complaint.  Specifically, Plaintiffs seek, at their election and

16   that of putative class members: buyback of the Affected Vehicles, including a full refund for the

17   software putative class members purchased; return of the premium paid for the Enhanced Autopilot,

18   if purchased, over the cost of the same model without Enhanced Autopilot; restitution for purchase of

19   service packages that will go unused as to cars bought back; and punitive damages for Tesla's

20   knowing fraud that garnered it illicit profits for a product suite that does not exist and put drivers at

21   risk.

22                           **II.      JURISDICTION**

23           6.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of

24   2005, 28 U.S.C. § 1332(d), because the proposed classes consist of 100 or more members; the

25   amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity

26

27

28

exists.  Tesla sold approximately 22,000 Model S and Model X vehicles in Q4 2016[2] and 25,000 Model S and Model X cars in Q1 2017.[3]  It is believed, and therefore alleged, that all or virtually all of these cars were equipped with inoperable Standard Safety Features, and likely at least half of these were equipped with second generation autopilot, *i.e.*, Autopilot 2.0 ("AP2.0") software costing $5,000 per vehicle.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### III.    VENUE

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  Furthermore, Tesla's principal place of business is in this judicial district, and it is believed, and therefore alleged, that a substantial amount of the conduct of which Plaintiffs complain occurred in this judicial district.  Further, Tesla has marketed, advertised, sold, and leased Affected Vehicles within this judicial district.  Additionally, the San Jose division of this Court is the proper division for filing given Tesla's headquarters in Palo Alto, California.

### IV.    PARTIES

**A.    Colorado Plaintiff**

8.      Plaintiff Dean Sheikh is a resident of Denver, Colorado.  Dean placed an order for his 2016 Model S 60 D on November 20, 2016, paying a $2,500 deposit.  On November 24, 2016, his vehicle design was confirmed with a purchase price of $81,200, inclusive of a $5,000 premium for Enhanced Autopilot.  At the time Dean placed the order for his car, Tesla's website and marketing materials indicated that the Standard Safety Features and Enhanced Autopilot features would be available in December 2016.

9.      Plaintiff Sheikh took delivery of his 2016 Model S 60 D on December 27, 2016.  At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-

---

[2] Tesla Press Release, *Tesla Q4 2016 Production and Deliveries* (Jan. 3, 2017), http://ir.tesla.com/releasedetail.cfm?releaseid=1006161.

[3] Christian Prenzler, *Tesla delivers a record 25,000 Model S, X in Q1 2017, 69% increase over Q1 2016*, Teslarati (Apr. 2, 2017), https://www.teslarati.com/tesla-delivers-record-25000-model-s-x-q1-2017-69-increase-q1-2016/.

1   functioning.  As of today, Enhanced Autopilot remains non-functioning or unsafe to use, and only a

2   front collision warning from the promised suite of Standard Safety Features has been enabled.

3       10.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint

4   because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that the

5   vehicle does not have; and (2) he paid an additional $5,000 premium for an Enhanced Autopilot

6   AP2.0 system that does not operate as advertised and is unsafe to use.

7   **B.      Florida Plaintiff**

8       11.     Plaintiff John Kelner is a resident of Davie, Florida.  John visited the Tesla showroom

9   on December 10, 2016, and picked out the car that he wanted, a 2016 Model S 90 D.  While at the

10  showroom, he placed an order through Tesla's online system and paid his initial $2,500 deposit on a

11  credit card.  On December 14, 2016, John paid a $ 24,333.57 initial lease payment.  His vehicle

12  design was confirmed with a purchase price of $ 108,700.00, inclusive of a $5,000 premium for

13  Enhanced Autopilot.  At the time John placed the order for his car, Tesla's website and marketing

14  materials indicated that the Standard Safety Features and Enhanced Autopilot features would be

15  available in December 2016.

16      12.     Plaintiff Kelner took delivery of his Tesla on December 16, 2016.  At the time of

17  delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-functioning.

18  As of today, Enhanced Autopilot remains non-functioning or unsafe to use, and only a front collision

19  warning from the promised suite of Standard Safety Features has been enabled.

20      13.     Plaintiff Kelner has been directly harmed by Tesla's actions as described in this

21  complaint because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that

22  the vehicle did not have on delivery and does not have now; and (2) he paid an additional $5,000

23  premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe

24  to use.

25  **C.      New Jersey Plaintiff**

26      14.     Plaintiff Tom Milone is a resident of Jackson, New Jersey.  Tom placed an order for

27  his 2016 Model S 90 D on November 23, 2016, paying a $ 2,500 deposit.  His vehicle design was

28  confirmed with a purchase price of $ 113,200.00, inclusive of a $5,000 premium for Enhanced

Autopilot and a $3,000 premium for "Full Self-Driving Capability." At the time Tom placed the order for his car, Tesla's website and marketing materials indicated that the Standard Safety Features and Enhanced Autopilot features would be available in December 2016.

15.     Plaintiff Milone took delivery of his Tesla on December 29, 2016. At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-functioning. As of today, Enhanced Autopilot remains non-functioning or unsafe to use, and only a front collision warning from the promised suite of Standard Safety Features has been enabled.

16.     Plaintiff Milone has been directly harmed by Tesla's actions as described in this complaint because: (1) he paid the list price for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have; and (2) he paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

**D.      Defendant**

17.     Tesla, Inc. d/b/a Tesla Motors, Inc. is a Delaware corporation. As stated above, its principal place of business is located in Palo Alto, California.

18.     Tesla has a system of company-owned Tesla dealerships in states throughout the union, via which it distributes, markets, advertises, and sells Tesla-branded goods and vehicles.

19.     Tesla's authorized dealerships are tightly controlled by Tesla and are the agents of Tesla. Tesla controls the marketing practices of Tesla-authorized dealerships, the repair facilities within those dealerships, and even the appearance of said dealerships. Additionally, Tesla trains the personnel at Tesla-authorized dealerships.

20.     At all times relevant to this action, Tesla designed, manufactured, marketed, distributed, sold, leased, and warranted the Affected Vehicles, including the Enhanced Autopilot AP2.0 system, under the Tesla brand name by and through its dealerships. Tesla also designed, manufactured, and installed the defective AP2.0 system in the Affected Vehicles. Tesla also developed and disseminated advertisements and other promotional materials relating to the Affected Vehicles and, more specifically, to its Standard Safety Features and Enhanced Autopilot AP2.0 system.

V.       FACTUAL ALLEGATIONS

A.       **Tesla's Marketing and Sale of Vaporware**

21.       As Dictionary.com states, vaporware is "[c]omputer software that is advertised but still nonexistent."  Tesla advertised vaporware to consumers, knowing full well that this particular come-on would particularly excite its target market of high-tech aficionados.

1.       **Standard Safety Features**

22.       Tesla's website describes its "Standard Safety Features" to include: (1) Automatic Emergency Braking; (2) Front Collision Warning; (3) Side Collision Warning; and (4) Auto High Beams.[4]  Customers who ordered their cars from approximately mid-October 2016 through mid-January 2017 were told these features would "become available in December 2016 and roll out through over-the-air software updates[.]"  In mid-January 2017, Tesla modified its website to state: "These active safety technologies, including collision avoidance and automatic emergency braking, have begun rolling out through over-the-air updates."  Many customers, including Plaintiffs in this action, were shocked to discover these features did not exist when they picked up their cars, and as yet, only one of the specifically referenced features have not been implemented.

2.       **New Hardware and Software**

23.       On October 19, 2016, Tesla stated in a blog post:

> We are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver.  Eight surround cameras provide 360 degree visibility around the car at up to 250 meters of range.  Twelve updated ultrasonic sensors complement this vision, allowing for detection of both hard and soft objects at nearly twice the distance of the prior system.  A forward-facing radar with enhanced processing provides additional data about the world on a redundant wavelength, capable of seeing through heavy rain, fog, dust and even the car ahead.
>
> To make sense of all of this data, a new onboard computer with more than 40 times the computing power of the previous generation runs the new Tesla-developed neural net for vision, sonar and radar processing

_____

[4] _See_ Tesla Autopilot webpage, https://www.tesla.com/autopilot (last visited Apr. 19, 2017).

software.  Together, this system provides a view of the world that a driver alone cannot access, seeing in every direction simultaneously and on wavelengths that go far beyond the human senses.[5]

24.    Tesla's website filled in some details.  Shortly after Tesla's October 19, 2016 announcement, its website stated:  "All Tesla vehicles produced in our factory, including Model 3, have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver."[6]  It also advised that consumers would need to pay $5,000 more (at the time of ordering, or $6,000 thereafter) to unlock software that would activate the "Enhanced Autopilot" aspect of the new hardware.

25.    On or about October 20, 2016, the day after it announced its new hardware features, Tesla posted a video to its website that gave a demonstration of certain self-driving features made possible by HW2.  That video continues to be available on Tesla's website.[7]

26.    Shortly thereafter, on or about November 18, 2016, Tesla presented another self-driving video on its website.  When consumers pushed the "Learn More" button under the statement:  "All Tesla vehicles produced in our factory, including Model 3, have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver," they first would be invited to see a video lasting over two minutes, in which the initial frames shouted:  "THE PERSON IN THE DRIVER'S SEAT IS ONLY THERE FOR LEGAL REASONS.  HE IS NOT DOING ANYTHING.  THE CAR IS DRIVING ITSELF."  The video, presented at a sped-up rate, shows a Tesla driving by itself to a destination a good distance away, taking a path replete with curves, much vehicular traffic, pedestrians, stop signs, and turns.  The car self-parks at the end of the route.  It's a remarkable piece of salesmanship for the car's newly enhanced hardware and software that was only available on Tesla vehicles.

---

[5] *All Tesla Cars Being Produced Now Have Full Self-Driving Hardware*, Tesla (Oct. 19, 2016) https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-self-driving-hardware.

[6] Tesla Design webpage, available at http://web.archive.org/web/20161022202131/ https://www.tesla.com/models/design (capture from Oct. 22, 2016) (last visited Mar. 20, 2017).

[7] *Full Self-Driving Hardware on All Teslas*, Tesla, https://www.tesla.com/videos/full-self-driving-hardware-all-tesla-cars (last visited Apr. 19, 2017).

CLASS ACTION COMPLAINT                    - 7 -
Case No.
010681-11  953105 V1

27.     Underneath this video, Tesla presented (and presents) consumers with descriptions of the newly enhanced hardware installed on its latest models.  The descriptions speak to eight "surround cameras," twelve "updated ultrasonic sensors," and radar, too.  They also speak to "a new onboard computer with over 40 times the computing power of the previous generation" as well as a new "neural net for vision, sonar and radar processing software."

28.     But getting the system to come to life required customers to pay an extra $5,000 for Tesla's Enhanced Autopilot software system.[8]  According to Tesla's summary:

> Enhanced Autopilot adds these new capabilities to the Tesla Autopilot driving experience.  Your Tesla will match speed to traffic conditions, keep within a lane, automatically change lanes without requiring driver input, transition from one freeway to another, exit the freeway when your destination is near, self-park when near a parking spot and be summoned to and from your garage.

> Tesla's Enhanced Autopilot software is expected to complete validation and be rolled out to your car via an over-the-air update in December 2016, subject to regulatory approval.[9]

29.     Thus, if consumers pushed the "Order Now" button between approximately October 22, 2016, and at least through January 23, 2017,[10] they would see as an option for purchase:

> **Enhanced Autopilot**

> Enhanced Autopilot adds new capabilities to the Tesla Autopilot driving experience.  The enhancements include going from one to four cameras for greater accuracy, redundancy, and to see fast-approaching vehicles in adjacent lanes.  In addition, 12 ultrasonic sonar sensors provide 360 degree coverage around your car with almost twice the range and resolution of the prior version.

> The significantly increased sensor information is processed by a computer that is over 40 times more powerful than before.  Your Tesla

---

[8] The customer could activate even more features if he paid thousands of dollars extra to active Tesla's "Full Self-Driving Capability" software system.  *See, e.g.*, Tesla Design webpage, https://www.tesla.com/modelx/design (current page for Model X vehicle, describing this system) (last visited April 19, 2017).

[9] Tesla autopilot webpage, available at http://web.archive.org/web/20170123045718/ https://www.tesla.com/autopilot (capture from Jan. 23, 2017) (last visited Mar. 20, 2017).

[10] *See* Tesla autopilot webpage, available at http://web.archive.org/web/20170123043328/ https://www.tesla.com/autopilot (capture from Jan. 23, 2017) (last accessed Mar. 20, 2017).

will match speed to traffic conditions, keep within a lane, automatically change lanes without requiring driver input, transition from one freeway to another, exit the freeway when your destination is near, self-park when near a parking spot and be summoned to and from your garage.  That said, Enhanced Autopilot should still be considered a driver's assistance feature with the driver responsible for remaining in control of the car at all times.

*Tesla's Enhanced Autopilot software is expected to complete validation and be rolled out to your car via an over-the-air update in December 2016, subject to regulatory approval.*[11]

30.     The website stated (and continues to state) that Enhanced Autopilot is available for $5,000 if ordered pre-delivery, or $6,000 if ordered later.

31.     Customers like Plaintiffs found themselves unable to resist Tesla's marketing pitches. They purchased cars that they believed had (or at least by the end of December 2016 would have) the Standard Safety Features that Tesla touted and they also believed Tesla's representations as to Enhanced Autopilot features and what to expect regarding delivery.

32.     But they were deceived.  Real-world performance shows that the software needed to actually implement the Standard Safety Features and Enhanced Autopilot was nowhere near ready for the vital tasks for which it was sold.  This is not simply a matter of Tesla missing the December 2016 roll-out timeline it marketed for its Standard Safety Features and Enhanced Autopilot software (which would be deceptive enough).  Nor is this a matter of merely waiting for "regulatory approval."  Instead, the actual behavior of cars equipped with the new hardware and software combination speaks to Tesla's deceptiveness.

33.     Tesla had to know how deeply flawed, raw, and untested the software was and remains.  In fact, new vehicles equipped with Tesla's newest software *still* do not have some of the basic safety features that are standard features of cars equipped with the older software—and that are supposed to be standard features of Tesla's newest vehicles, too.  Yet Tesla promised imminent safety-enhanced and auto-driving nirvana.

---

[11] Tesla design webpage, available at http://web.archive.org/web/20161022202131/ https://www.tesla.com/models/design (capture from Oct. 22, 2016) (last visited Mar. 20, 2017) (emphasis added).

CLASS ACTION COMPLAINT                              - 9 -
Case No.
010681-11  953105 V1

**B.      Real-World Performance**

**1.      Generally**

34.      As of the date of this Complaint, Tesla has not released truly functional software for its Standard Safety Features or Enhanced Autopilot.  A February 27, 2017 article at Jalopnik.com, an automobile enthusiast website, describes a Tesla equipped with Autopilot 2.0[12]—a combination of Tesla's new hardware and software—behaving as if a drunk driver is at the wheel.

> The video from Tesla owner "Scott S." shows his Model S driving with Autosteer and Traffic-aware cruise control (TACC) engaged while driving.  It doesn't go well.  At times, the car veers toward curbs and merges across the double yellow line.  Scott wrote in the comment section that he has driven that particular road at least 30 times, making the Autopilot failure seem even more strange.[13]

The accompanying video in fact shows the vehicle behaving in a highly dangerous manner.  And "Scott," the subject of the article, attributes all of this to software issues rather than any sort of need to calibrate cameras (a notion suggested by Tesla's CEO Elon Musk).  Scott advises that he owns two AP2.0 Teslas and suggests that both are exhibiting the same behavior, rendering it highly unlikely that the exact same calibration issue would be present on both vehicles.  *Id.*  Indeed, Mr. Musk himself has stated only that "*[s]ome* cars will require adjustment of camera pitch angle by service." *Id.* (emphasis added).

35.      Another online article, this one published at backchannel.com and dated March 3, 2017, describes a Tesla with AP2.0 "zig-zagging wildly across the road," eliciting scared shouts

_____

[12] Hereafter, including in the Violations Alleged, Plaintiffs, unless the context indicates otherwise, refer to the software suite that enables the Standard Safety Features and the optional Enhanced Autopilot features as AP2.0.  *See* Jordon Golson, *Tesla says focus on safety is driving the step-by-step Autopilot 2 rollout*, The Verge (Jan. 23, 2017), http://www.theverge.com/2017/1/23/14351764/tesla-autopilot-2-rollout-self-driving-safety ("Tesla CEO Elon Musk calls the new sensor suite 'HW2,' an acronym for second-generation hardware, and the software is called AP2.  Tesla considers the entire suite of safety and driver assist features to be the Autopilot Safety Features, though the Autosteer and traffic-aware cruise control features are what most people consider 'Autopilot.'").

[13] Ryan Felton, *Watch Tesla Autopilot 2.0 Drive Like A Drunk Old Man*, Jalopnik (Feb. 27, 2017), http://jalopnik.com/watch-tesla-autopilot-2-0-drive-like-a-drunk-old-man-1792785936.

from the driver's wife.[14]  That driver also describes a situation where "[y]ou can be sailing along at 50 mph and the radar spots [an approaching] bridge and immediately slams on the brakes."  "The other extreme is that you approach a stoplight with a car already stopped, and the Tesla doesn't apply the brakes at all," said the driver.  "It's really a pretty scary experience," he said.  "If you'd ridden in the car with my wife, you would know how many times she's screamed to turn it off."

36.     In this same article, Tesla admits that the software is in beta phase.  But this was not communicated on Tesla's website or its promotional materials before or at the time of purchase.  And while the software seems to be improving due to the data collected by way of human testers such as those featured in this article, it may be that there are fundamental flaws in the software:

> It's an open question how many of the system's glitches stem from insufficient testing, versus more entrenched flaws in its underlying design.  "Having a wealth of data is incredibly powerful but the [software] is also massively important and very difficult," says Karl Iagnemma, CEO of NuTonomy, a provider of AI systems for self-driving cars.  "The algorithmic element is often something that can't be sped up simply by having access to more data—it's a process of painstaking development."[15]

37.     This difficulty with the software is no doubt the reason why Enhanced Autopilot cars are only using one to two of the eight available cameras at this time.[16]  One would think that this would mean that AP2.0 cars are at least at parity with older cars equipped with the former Autopilot system, which only had one camera, but this would be wrong.  Tesla is still seeking parity with those older cars, which are regularly used during test drives in order to sell customers on the AP2.0 system.

---

[14] Mark Harris, *Tesla Drivers Are Paying Big Bucks to Test Flawed Self-Driving Software*, Backchannel (Mar. 3, 2017), https://backchannel.com/tesla-drivers-are-guinea-pigs-for-flawed-self-driving-software-c2cc80b483a.

[15] *Id.*

[16] Raphael Orlove, *Clever Owner Uses Tape To Discover Nearly All Of Tesla's New Cameras Do Nothing*, Jalopnik (Feb. 28, 2017), http://jalopnik.com/clever-owner-uses-tape-to-discover-nearly-all-of-teslas-1792825392.  One report concerning the March 29. 2017 roll out of version 8.1 software for Tesla cars reports that the software is now using two of the eight on board cameras, purportedly improving the Enhanced Autopilot (AP2), but not yet to the level of the original autopilot (AP1) features.  *See* Fred Lambert, *Tesla's Autopilot 2.0 is now using 2 out of 8 cameras with the new update*, Electrek (Mar. 30, 2017), https://electrek.co/2017/03/30/tesla-autopilot-2-0-camera-8-1-update/.

This practice plainly was meant to foster the impression that AP2.0 would work at least as well as AP1.0 out of the gate, but that impression was false—and Tesla, which operates its own dealerships, plainly knew it.

38.     After all, Tesla has not disclosed to buyers such as Plaintiffs that it actually was starting over from scratch with its AP2.0 system and not building on the AP1.0 system at all.  Tesla lost the right to use that older software as the basis for AP2.0.  As the backchannel.com article explains:

> Mobileye, the Israeli company that supplied the original camera and software for Autopilot, cited safety concerns when it pulled out of its partnership with Tesla.  The company's chief technology officer told Reuters that Tesla was "pushing the envelope in terms of safety … [Autopilot] is not designed to cover all possible crash situations in a safe manner."  Tesla says the collaboration ended for commercial reasons.[17]

Whether Tesla can replicate even what the Mobileye system could do remains a dangerously open question, yet Tesla purposely gave consumers the impression that Enhanced Autopilot would be available on their cars as of December 2016, and effective self-driving in a host of situations would be theirs, but only if they paid an additional $5,000 to secure the EAP functionality.

39.     What is more, Tesla was far behind at least one self-driving competitor in terms of real-world testing of AP2.0 even as it began selling it to consumers with the promise that it soon would perform as advertised.[18]  While that competitor had logged "635,000 fully autonomous miles in California last year, with just 124 hand-offs to safety drivers," Tesla "reported zero autonomous miles in 2015, and *only 550* miles in 2016—during which a safety driver had to take control of the car 182 times."  *Id.* (emphasis added).  This comparison, too, speaks to Tesla's fundamental deceptiveness in the marketing and sale of AP2.0.

---

[17] Mark Harris, *Tesla Drivers Are Paying Big Bucks to Test Flawed Self-Driving Software*, Backchannel (Mar. 3, 2017), https://backchannel.com/tesla-drivers-are-guinea-pigs-for-flawed-self-driving-software-c2cc80b483a.

[18] *See, e.g.*, *id.*

CLASS ACTION COMPLAINT                                                                  - 12 -
Case No.
010681-11  953105 V1

2.      **Plaintiffs' Experiences**

a.      **Colorado Plaintiff Dean Sheikh**

40.     Plaintiff Dean Shiekh was first introduced to Tesla cars when his wife was searching for a replacement to her 2006 BMW X3 in November 2016.  Dean and his wife looked at the Tesla Model X but ultimately decided against it due to the falcon doors.  The door design prohibits a ski rack on top, which Dean and his wife needed in Denver.

41.     Dean was not in the market for a new car for himself, as he owned a low mileage 2013 Audi A7 (27k miles).  However, Dean really liked Tesla's Autopilot (AP1.0) feature on the car he test drove.  When Dean learned from Tesla's marketing materials that the new cars would come with an improved version (Enhanced Autopilot AP2.0) and an option to upgrade to Full Self Drive, Dean became very interested.

42.     All of the marketing materials that Dean saw in mid-November 2016 indicated that Enhanced Autopilot would be available by the end of December 2016 and would include all the function of AP1 plus many other functions, including the ability to change from one highway to another based on navigation input, and the ability to be upgraded to Full Self Driving ("FSD") when the software was approved by regulators.

43.     After test driving the AP1.0 car, Dean found and watched Tesla's FSD video that was on its website.[19]  This video significantly influenced Dean's decision to buy the Tesla Model S 60D.

44.     Only in March 2017, long after he had purchased his car, Dean learned that this video was patently misleading.  The video states in the beginning that the driver is only there for legal reasons and was not providing any input.  Dean learned from online sources that the driver provided input hundreds of times and that the video was simply pieced together and actually footage took days to tape.  Dean came to understand that editing made it look like Tesla had a working Full Self Drive prototype that was primarily ready and just waiting for regulatory approval.  But that was not true; Dean now believes that Tesla has no such prototype.

---

[19] *Autopilot Full Self-Driving Hardware (Neighborhood Long)*, Tesla, Inc., available at https://vimeo.com/192179727 (last visited Apr. 19, 2017).

45.     When Dean ordered his Tesla Model S 60D in late November 2016, the order form stated the following:  "Tesla's Enhanced Autopilot software is expected to complete validation and be rolled out to your car via an over-the-air update in December 2016 subject to regulatory approval."

46.     When Dean picked up his vehicle on December 17, 2016, the website made the same claim and the staff at the Tesla dealership confirmed that the software update was due "in a few days."

47.     It was not disclosed to Dean that the Standard Safety Features on his car would be inoperable, or that AP2.0 would be delivered slowly, over the course of months, or even years.  Dean understood Tesla's clear statement that that EAP would be rolled out via "an" over-the-air update. Dean understood "an update" to mean a single update available in December 2016 that would render the Standard Safety Features and Enhanced Autopilot fully operational.

48.     Dean understood and relied upon Tesla's marketing materials and order form that states that the EAP "adds new capabilities to the Tesla Auotpilot driving experience."  Dean later learned that the Tesla Autopilot experience (AP1.0) was withdrawn by its primary supplier, Mobileye.  Tesla's EAP does not add to AP1.0– it replaces the system that Dean test drove.

49.     Dean believed Tesla's marketing materials and expected EAP to safely "change lanes without requiring driver input, transition from one freeway to another, exit the freeway when your destination if near."  But none of this was available on his car when he took delivery and none of these features exist as of the filing of this complaint.  There is no set time table that has been disclosed for any of those options.

50.     Dean also believed that the Standard Safety Features would be available on his car when delivered, or at least sometime in December 2016, as promised.  But to date, Dean's car only has a rudimentary front collision warning.  It does not have the rest of these features, including Automatic Emergency Braking ("AEB").  And there is no time table for this important safety feature. Dean had no intention to buy a car that does not have AEB; it was standard on his prior Audi A7 and was a "must have" on Dean's feature list for a new car.

51.     In or about February 2017, an over-the-air update was sent to Dean's car by Tesla. This update allowed Dean to engage the Enhanced Autopilot on his car.  However, once engaged, the system operated in an unpredictable manner, sometimes veering out of lanes, lurching, slamming on the brakes for no reason, and failing to slow or stop when approaching other vehicles and obstacles. This rendered the Autopilot system unsafe to operate.  The suite of Standard Safety Features that Dean was promised remain inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers, and auto high beams.

52.     On or about March 30, 2017, a second over-the-air update was sent to Dean's car by Tesla.  According to Tesla, this update allowed the TACC to operate at speeds up to 80 mph and purportedly improved the functionality of the Enhanced Autopilot and the Standard Safety Features. However, except for front collision warning, the Standard Safety Features that Dean was promised remain inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers, and auto high beams.  In addition, the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no reason, and fails to brake when approaching large vehicles like trucks and buses.  The Enhanced Autopilot remains less capable than the original autopilot that it replaced, and in any event places Plaintiff, and all drivers and occupants of Tesla vehicles, at risk of serious injury or death.

53.     Dean reports that when using the auto-steer function on local roads, the car will consistently cross double solid lines and move into the lane for traffic coming the opposite direction. This happens even at low speed (20 mph) with gentle turns.

54.     When using TACC, the car will brake on the highway for no apparent reason.  It appears to see overhead signs and bridges as vehicles and will sometimes slam on the brakes, leaving the driver at risk of being re-ended.

55.     TACC often does not see buses directly ahead of Dean's car.  On April 3, 2017, Dean was following a bus, which was moving in front of him at speeds from 5 mph to 25 mph. The sensor display on Dean's Tesla showed nothing in front of the car the entire time.  Had Dean turned on the TACC, the car would have run into the bus without human intervention.  Later that week, TACC was

engaged when approaching a slow moving bus.  TACC did not attempt to brake.  Dean had to make an aggressive brake to avoid a collision

56.     The Enhanced Autopilot Features are simply too dangerous to be used, and are therefore, completely useless notwithstanding the $5,000 premium that Dean paid for Enhanced Autopilot.

57.     In Dean's car there is still no Automatic Emergency Braking, there are no side collision warnings, there is no auto high-beam, and the auto-sensing wipers remain inoperative.  All of these features were advertised as "standard" and included in the base price of the car.  Yet they were inoperable on delivery of the car, and they remain inoperable today.

58.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have.  As a result, he did not get the benefit of the bargain he struck, and his car is necessarily worth less than he paid for it because it does not have the Standard Safety Features.  In addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

**b.     Florida Plaintiff John Kelner**

59.     Plaintiff John Kelner took delivery of his Tesla Model S 90D on December 16, 2016.  The price included Tesla's Standard Safety Features, and John paid $5,000 extra for the Enhanced Autopilot.

60.     One year earlier, on December 24, 2015, the Tesla dealer had given John a 2015 Model S with the original version of autopilot for an extended test drive.  John drove the car from Ft. Lauderdale to Jupiter, Florida (about 2.5 hours each way).  John loved the car.  The car was equipped with the original version of Autopilot, which functioned safely, including the Autosteer and TACC features.  Naturally, John believed that a newer 2016 version, with an Enhanced Autopilot (including more cameras and sensors) would work even better.

61.     On his way home from the dealership, John attempted to engage the Enhanced Autopilot, but nothing happened.  There was no TACC, no autosteer, no Automatic Emergency

CLASS ACTION COMPLAINT          - 16 -
Case No.
010681-11  953105 V1

Braking, no auto-sensing wipers, and no auto high-beams.  Simply put, none of the safety features that were supposed to be "standard" were on his car, and none of the Enhanced Autopilot features worked.

62.     On or about February 2017, an over-the-air update was sent to Plaintiff Kelner's car by Tesla.  This update allowed John to engage the Enhanced Autopilot on his car.  However, once engaged, the system operated in an unpredictable manner, sometimes veering out of lanes, lurching, slamming on the brakes for no reason, and failing to slow or stop when approaching other vehicles and obstacles.  This rendered the Autopilot system unsafe to operate.  The suite of Standard Safety Features that John was promised remain inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers and auto high beams.

63.     On or about March 30, 2017, a second over-the-air update was sent to John's car by Tesla.  According to Tesla, this update allowed the TACC to operate at speeds up to 80 mph and purportedly improved the functionality of the Enhanced Autopilot and the Standard Safety Features.  However, the Standard Safety Features that John was promised remain inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers and auto high beams.  In addition, the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no reason, and fails to brake when approaching large vehicles like trucks and buses.  The Enhanced Autopilot remains less capable than the original autopilot that it replaced, and in any event places drivers and occupants of Tesla vehicles at risk of serious injury or death.

64.     John's car should, in fact, have the Standard Safety features that he paid for, and he should have obtained a functional Enhanced Autopilot—at least one as good as the one on the car he drove a year earlier—for the $5,000 premium that he paid to obtain it.

65.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because he paid the list price for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have.  As a result, he did not get the benefit of the bargain he struck, and his car is necessarily worth less than he paid for it because it does not have the Standard Safety Features.  In addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000

1    premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe

2    to use.

3               **c.      New Jersey Plaintiff Tom Milone**

4        66.      When starting to shop for a new vehicle Plaintiff Milone watched the Tesla video

5    online that many of Tom's friends were talking about.  It showed a Tesla Model S that can drive

6    itself and is still on the Tesla website.[20]  Tom understood the video to explain that a driver was just in

7    the vehicle for legal purposes and that this vehicle could drive anyone from point A to B and even let

8    the occupants out and go park itself.  The website even mentioned that using a self-driving Tesla for

9    car sharing and ride hailing for friends and family would be fine and details on the ride sharing

10   would be released next year.

11       67.      Tom was amazed at the video and noticed that all literature he had seen said that these

12   features would be released December 2016.  Having a sick mother-in-law that always needed to be

13   picked up and brought to doctor appointments, food stores, etc., Tom thought he would have great

14   use of this full self-driving system.  Tom thought at the time that Autopilot and the advertised safety

15   features were available because they were selling the features already.

16       68.      On November 21, 2016, Tom paid a deposit on a new Model S with Enhanced

17   AutoPilot ($5000) and the FSD ($3000).

18       69.      Tom picked up his Tesla Model S on December 29th and was very excited to begin to

19   use all the promised Standard Safety Features and the Autopilot.  At the time of delivery, Tesla's

20   website showed the Enhanced Auto Pilot and safety features would be rolled out by December 2016.

21   Tom attempted to use the Enhanced Autopilot, but nothing happened.  There was no TACC, no

22   autosteer, no Automatic Emergency Braking, no auto-sensing wipers, no auto high-beams.  Simply

23   put, none of the safety features that Tesla promised as "standard" were on his car, and none of the

24   Enhanced Autopilot features worked.  Tom waited patiently for the features that he paid for, but they

25   were never enabled.  As of the filing of this complaint, Tom still has not received the functionality

26   that he paid for.

27

28       [20] Tesla Autopilot webpage, https://www.tesla.com/autopilot (last visited Apr. 19, 2017).

70.     While Tesla has released some updates to enable some AutoPilot functions, the system is nowhere near what was presented to Tom in Tesla's promotional material.  Tom still does not have Automatic Emergency Braking, side collision warnings, Auto High Beams or Auto Windshield Wipers.  The AutoPilot system that is available is limited to only highways and the system is not very stable.  It does not see large objects such as trucks, and if a lane line fades the vehicle veers off to the side of the road.  This rendered the Autopilot system unsafe to operate.  The system falls far short of Tom's expectations based upon Tesla's promises.

71.     When Tom ordered his Tesla, he believed and relied on Tesla's website and promotional materials that promised a suite of "Standard Safety Features" and "Enhanced Autopilot."  Tom believed Tesla when it promised these features would be available in December 2016.

72.     On or about March 30, 2017, a second over-the-air update was sent to Tom's car by Tesla.  According to Tesla, this update allowed the TACC to operate at speeds up to 80 mph and purportedly improved the functionality of the Enhanced Autopilot and the Standard Safety Features.  However, the Standard Safety Features that Tom was promised remain inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers and auto high beams.  In addition, the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no reason, and fails to brake when approaching large vehicles like trucks and buses.  The Enhanced Autopilot remains less capable than the original autopilot that it replaced, and in any event places drivers and occupants of Tesla vehicles at risk of serious injury or death.

73.     Tom's car should, in fact, have the Standard Safety features that he paid for, and he should have obtained a functional Enhanced Autopilot for the $5,000 premium that he paid to obtain it.

74.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because he paid the list price for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have.  As a result, he did not get the benefit of the bargain he struck, and his car is necessarily worth less than he paid for it because it does not have the Standard Safety Features.  In addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000

premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

**C.    Tesla's Violation of the Motor Vehicle Safety Act**

75.    Based on the foregoing, Tesla has violated the Motor Vehicle Safety Act (the "Act").

76.    That Act requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

77.    Tesla vehicles equipped with AP2.0 have safety defects, as described above. Yet Tesla has not complied with its obligations under the Act. Certainly Plaintiffs have received no notice that they were sold a defective vehicle.

**D.    Tesla's False Advertising and Fraudulent Misrepresentations**

78.    Tesla marketed AP2.0 via its website and through its company-owned-and-operated dealerships.

79.    Putative class members paid large premiums to purchase and lease the Affected Vehicles. Had Tesla disclosed that its "Standard Safety Features" were completely inoperable upon delivery, and—except for front collision warning—are as yet still unavailable, it would not have been able to command the extraordinarily high base price of its cars.

80.     Customers had to pay an extra $5,000 for cars equipped with the Enhanced Autopilot AP2.0 software.  The difference in the MSRP of vehicles with and without AP2.0 software directly and proportionally increased the agreed-upon cash value of the vehicles, which directly and proportionally increased the monthly lease and/or purchase, interest, and tax payments.  Class members were harmed from the day they drove their Affected Vehicle off the lot because they did not get that for which they paid.

81.     In addition, many putative class members purchased extended service agreements for their Affected Vehicles because they intended to own the vehicles for many years beyond the initial warranty.  However, as a result of the unavailability of the Standard Safety Features, and inoperability of the Enhanced Autopilot AP2.0 system, class members no longer want to own the Affected Vehicles; accordingly, they have lost the value of the extended warranties that they purchased.

82.     As a result of Tesla's unfair, deceptive, and/or fraudulent business practices, owners and lessees of the Affected Vehicles, including the Plaintiffs, have suffered losses in money and/or property.  Had Plaintiffs and putative class members known of the lack of Standard Safety Features and the AP2.0 inoperability and defects at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased their vehicles at all, or they would have paid substantially less for the vehicles than they did, and/or they would not have paid the $5,000 premium for Enhanced Autopilot AP2.0 software.

## VI.     CLASS ALLEGATIONS

83.     Plaintiffs bring this action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Colorado Class**
>
> All persons or entities who, in the state of Colorado, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**Colorado Enhanced Autopilot Subclass**

All members of the Colorado class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

**Florida Class**

All persons or entities who, in the state of Florida, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**Florida Enhanced Autopilot Subclass**

All members of the Florida class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

**New Jersey Class**

All persons or entities who, in the state of New Jersey, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**New Jersey Enhanced Autopilot Subclass**

All members of the New Jersey class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

84.     Excluded from the proposed classes are Tesla, its employees, officers, directors, legal representatives, heirs, successors, wholly or partly owned, and its subsidiaries and affiliates, Tesla dealers, and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons who make a timely election to be excluded from the proposed classes.

85.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

86.     This action has been brought and may be properly maintained on behalf of the classes proposed herein under Federal Rule of Civil Procedure 23.

CLASS ACTION COMPLAINT                              - 22 -
Case No.
010681-11  953105 V1

87.     Numerosity.  Federal Rule of Civil Procedure 23(a)(1):  The members of the classes proposed herein are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable.  While Plaintiffs believe that there are thousands of members of the proposed classes, the precise number of class members is unknown to them, but may be ascertained from Tesla's books and records.  Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

88.     Commonality and Predominance.  Federal Rule of Civil Procedure 23(a)(2) and (b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

     a.    Whether Tesla engaged in the conduct alleged herein;

     b.    Whether Tesla designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

     c.    Whether the Affected Vehicles contains one or more safety defects, including the inoperability of the Standard Safety Features and Enhanced Autopilot;

     d.    Whether Tesla knew about the defect(s), and, if so, for how long;

     e.    Whether Tesla designed, manufactured, marketed, and distributed Affected Vehicles and the AP2.0 system;

     f.    Whether Tesla's conduct violates consumer protection statutes, false advertising laws, sales contracts, and other laws as asserted herein;

     g.    Whether Plaintiffs and proposed class members overpaid for their Affected Vehicles and the AP2.0 system;

     h.    Whether Plaintiffs and other putative class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

     i.    Whether Plaintiffs and other putative class members are entitled to damages and other monetary relief and, if so, in what amount.

89.    Typicality.  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Tesla's wrongful conduct as described above.

90.    Adequacy.  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate proposed class representatives because their interests do not conflict with the interests of the other members of the proposed classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the proposed classes will be fairly and adequately protected by Plaintiffs and their counsel.

91.    Declaratory and Injunctive Relief.  Federal Rule of Civil Procedure 23(b)(2):  Tesla have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the proposed classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed classes as a whole.

92.    Superiority.  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Tesla, so it would be impracticable for the members of the proposed classes to individually seek redress for Tesla's wrongful conduct.  Moreover, even if class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, as well as comprehensive supervision by a single court.

## VII.   VIOLATIONS ALLEGED

**A.   Colorado**

### COUNT I

### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101, *ET SEQ.*)

93.      Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

94.      Plaintiff Dean Sheikh brings this Count on behalf of himself and the Colorado class and subclass ("Colorado class").

95.      Tesla is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101, *et seq.*

96.      Plaintiff and Colorado class members are "consumers" for purposes of Colo. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Affected Vehicles.

97.      The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  Tesla engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Affected Vehicles that had the capacity or tendency to deceive Colorado Class members; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade even though Tesla  knew or should have known they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Affected Vehicles that was known to Tesla  at the time of advertisement or sale with the intent to induce Colorado Class members to purchase, lease, or retain the Affected Vehicles.

98.      In the course of business, Tesla willfully failed to disclose and actively concealed the defects in the AP2.0 system discussed herein, and it otherwise engaged in activities with a tendency or capacity to deceive.  Tesla also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Affected Vehicles.

99.     Tesla knew that it had designed and installed a defective AP2.0 system and knew that the system would not be ready as advertised.  Tesla knew this information but concealed all of it.

100.     Tesla was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and that jeopardized the safety of the vehicles' occupants.  Tesla concealed this information as well.

101.     By failing to disclose that the AP2.0 system was defective, by marketing Tesla vehicles as safe, reliable, and of high quality, and by presenting Tesla as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Tesla engaged in deceptive business practices in violation of the Colorado CPA.

102.     Tesla's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the AP2.0 system and when it would be fully and safely functional, the quality of the Tesla brand, the devaluing of safety and performance at Tesla, and the true value of the Affected Vehicles.

103.     Tesla intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Colorado class.

104.     Tesla knew or should have known that its conduct violated the Colorado CPA.

105.     As alleged above, Tesla made material statements about the safety and performance of the Affected Vehicles and the Tesla brand that were either false or misleading.

106.     Tesla owed Plaintiff and the Colorado class a duty to disclose the true safety, performance, and reliability of the Affected Vehicles, and the devaluing of safety and performance at Tesla, because Tesla:

        a.      Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

        b.      Intentionally concealed the foregoing from Plaintiff and the Class; and/or

        c.      Made incomplete representations about the safety and performance of the Affected Vehicles generally, and the defective AP2.0 system in particular, while purposefully

withholding material facts from Plaintiff and the Class that
contradicted these representations.

107.    Because Tesla fraudulently concealed the defective nature of the AP2.0 system and
the true performance of its vehicles bearing the AP2.0 system, resulting in a raft of negative publicity
once the defects finally began to be disclosed, the value of the Affected Vehicles has diminished.  In
light of the stigma attached to those vehicles by Tesla's conduct, they are now worth significantly
less than they otherwise would be.

108.    Tesla's fraudulent sales and deployment of the defective AP2.0 system and the true
performance of Tesla vehicles equipped with this system were material to Plaintiff and the Colorado
class.  A vehicle made by a reputable manufacturer of safe, high-performing electric vehicles is safer
and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of
unsafe electric vehicles that conceals defects rather than promptly remedying them.

109.    Plaintiff and the Colorado class suffered ascertainable loss caused by Tesla's
misrepresentations and its concealment of and failure to disclose material information.  Class
members who purchased the Affected Vehicles either would have paid less for their vehicles or
would not have purchased or leased them at all but for Tesla's violations of the Colorado CPA.

110.    Tesla had an ongoing duty to all Tesla customers to refrain from unfair and deceptive
practices under the Colorado CPA.  All owners of Affected Vehicles suffered ascertainable loss in
the form of the diminished value of their vehicles as a result of Tesla's deceptive and unfair acts and
practices made in the course of Tesla's business.

111.    Tesla's violations present a continuing risk to Plaintiff and the Colorado class as well
as to the general public.  Tesla's unlawful acts and practices complained of herein affect the public
interest.

112.    As a direct and proximate result of Tesla's violations of the Colorado CPA, Plaintiff
and the Colorado class have suffered injury-in-fact and/or actual damage.

113.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff, individually and on behalf of the
Colorado class, seeks monetary relief against Tesla measured as the greater of (a) actual damages in

CLASS ACTION COMPLAINT                            - 27 -
Case No.
010681-11  953105 V1

1    an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory

2    damages in the amount of $500 for himself and each Colorado class member.

3         114.    Plaintiff also seeks an order enjoining Tesla's unfair and/or deceptive acts or

4    practices, punitive damages, and attorneys' fees, and any other just and proper relief available under

5    the Colorado CPA.

6                                        **COUNT II**

7                               **FRAUD BY CONCEALMENT**

8         115.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set

9    forth herein.

10        116.    Plaintiff Sheikh brings this Count on behalf of himself and the Colorado class.

11        117.    Tesla concealed and suppressed material facts concerning the quality of Tesla

12   vehicles and the Tesla brand.

13        118.    Tesla concealed and suppressed material facts concerning the safety, performance,

14   and quality of the Affected Vehicles.  As alleged in this Complaint, notwithstanding their promises

15   as to the readiness and capabilities of the AP2.0 system, Tesla knowingly and intentionally designed

16   and incorporated a system that would not permit safe operation of the vehicle.

17        119.    Tesla did so in order to boost confidence in its vehicles and falsely assure purchasers

18   and lessees of Tesla vehicles that Tesla is a reputable manufacturer that stands behind its vehicles

19   after they are sold, and that its vehicles are safe, reliable, and perform as promised.  The false

20   representations were material to consumers, both because they concerned the safety of the Affected

21   Vehicles and because the representations played a significant role in the value of the vehicles.

22        120.    Plaintiff and Colorado class members viewed advertising on Tesla's website and

23   elsewhere that touted the features and availability of the AP2.0 system.  They had no way of

24   knowing that Tesla's representations were false and gravely misleading.  Plaintiff and Colorado class

25   members did not and could not unravel Tesla's deception on their own.

26        121.    Tesla had a duty to disclose the true performance of Tesla vehicles equipped with an

27   AP2.0 system because knowledge of the scheme and its details were known and/or accessible only to

28   Tesla; Tesla had superior knowledge and access to the facts; and Tesla knew the facts were not

CLASS ACTION COMPLAINT                    - 28 -
Case No.
010681-11  953105 V1

known to, or reasonably discoverable, by Plaintiff and the Colorado class. Tesla also had a duty to disclose because it made many general affirmative representations about the about the qualities of its vehicles equipped with the AP2.0 system, starting with references to them as vehicles with *auto-pilot* capabilities, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of its vehicles, its actual decision to put sales and profits over safety, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff, Tesla had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the safety and the value of the Affected Vehicles purchased or leased by Plaintiff and the Colorado class. Whether a vehicle is safe to drive, and whether that vehicle's manufacturer tells the truth with respect to the vehicle's capabilities, performance, and safety are material concerns to a consumer, as evidenced by the approximately $5,000 premium paid for the Teslas equipped with an AP2.0 system.

122.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not perform as other premium vehicles on the market, including as to safety features of these vehicles, which perception would hurt the brand's image and cost Tesla money, and it did so at the expense of Plaintiff and the Colorado class.

123.    On information and belief, Tesla has still not made full and adequate disclosures and continues to defraud Plaintiff and the Colorado class by concealing material information regarding the safety and performance of its vehicles.

124.    Plaintiff and the Colorado class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the AP2.0-equipped vehicles manufactured by Tesla, and/or would not have continued to drive their Affected Vehicles or would have taken other affirmative steps. Plaintiff's and the Colorado class members' actions were justified. Tesla was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Colorado class.

125.    Because of the concealment and/or suppression of the facts, Plaintiff and the Colorado class sustained damage because they did not receive the Standard Safety Features that Tesla promised as included in the purchase price of their vehicle and they did not receive value for the approximately $5,000 premium paid, and they own vehicles that diminished in value as a result of Tesla's concealment of, and failure to timely disclose, the actual safety and performance of Tesla vehicles with AP2.0 systems.  Had they been aware of the true safety and performance of the Affected Vehicles, Plaintiff and Colorado class members who purchased or leased the Affected Vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

126.    The value of all Colorado class members' Affected Vehicles has diminished as a result of Tesla's fraudulent concealment of the true capabilities of the AP2.0 system, which has greatly tarnished the Tesla brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Colorado class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proven at trial.

127.    Accordingly, Tesla is liable to the Colorado class for damages in an amount to be proven at trial.

128.    Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Colorado class members' rights and well-being to enrich Tesla.  Tesla's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

## UNJUST ENRICHMENT

129.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

130.    In the event that no adequate legal remedy is available, Plaintiff Sheikh brings this Count in the alternative on behalf of himself and the Colorado class.

131.    Tesla has received and retained a benefit from Plaintiff and the Colorado class and inequity has resulted.

CLASS ACTION COMPLAINT                                          - 30 -
Case No.
010681-11  953105 V1

132.    Tesla has benefitted from selling and leasing defective cars whose value was artificially inflated by Tesla's concealment of the defective AP2.0 system at a profit, and Plaintiff and the Colorado class have overpaid for the cars and been forced to pay other costs.

133.    Thus, all Colorado class members conferred a benefit on Tesla.

134.    It is inequitable for Tesla to retain these benefits.

135.    Plaintiff and the Colorado class were not aware of the true facts about the Affected Vehicles and did not benefit from Tesla's conduct.

136.    Tesla knowingly accepted the benefits of its unjust conduct.

137.    As a result of Tesla's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**B.    Florida**

**COUNT I**

**VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT
(FLA. STAT. § 501.201, *ET SEQ.*)**

138.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

139.    Plaintiff John Kelner brings this Count on behalf of himself and the Florida class and subclass ("Florida class").

140.    Plaintiff and Florida class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

141.    Tesla engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

142.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

143.    In the course of business, Tesla willfully failed to disclose and actively concealed the defective AP2.0 system discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Tesla also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of

any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Affected Vehicles.

144.    Tesla knew it had designed and installed a defective AP2.0 system and knew that the system did not work as advertised.  Tesla also knew that it could not meet its delivery timeline, but it concealed all of that information.

145.    Tesla was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicles' occupants.  Tesla concealed this information as well.

146.    By failing to disclose that defects in the AP2.0 system, by misrepresenting its delivery date, by marketing Tesla vehicles as safe, reliable, and of high quality, and by presenting Tesla as a reputable manufacturer that valued safety and stood behind their vehicles after they were sold, Tesla engaged in deceptive business practices in violation of the FUDTPA.

147.    Tesla's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Florida class members, about the true performance of Tesla vehicles equipped with AP2.0 systems, the quality of the Tesla brand, the devaluing of safety and performance at Tesla, and the true value of the Affected Vehicles.

148.    Tesla intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Florida class.

149.    Tesla knew or should have known that its conduct violated the FUDTPA.

150.    As alleged above, Tesla made material statements about the safety and performance of the Affected Vehicles and the Tesla brand that were either false or misleading.

151.    Tesla owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Affected Vehicles, and the devaluing of safety and performance at Tesla, because Tesla:

    a.    Possessed exclusive knowledge that they valued profits and cost-cutting over safety and performance, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiff and the Florida class; and/or

      c.     Made incomplete representations about the safety and performance of the Affected Vehicles generally, and the defective AP2.0 system in particular, while purposefully withholding material facts from Plaintiff and the Florida class that contradicted these representations.

152.    Because Tesla fraudulently concealed defects in its AP2.0 system (as well as its anticipated delivery date) and the true performance of Tesla vehicles equipped with AP2.0 systems, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Tesla's conduct, they are now worth significantly less than they otherwise would be.

153.    Tesla's fraudulent use of the defective AP2.0 system and the true performance of Tesla vehicles equipped with this system were material to Plaintiff and the Florida class.  A vehicle made by a reputable manufacturer of safe, high-performing electric vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe electric vehicles that conceals defects rather than promptly remedying them.

154.    Plaintiff and the Florida class suffered ascertainable loss caused by Tesla's misrepresentations and their concealment of and failure to disclose material information.  Class members who purchased the Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Tesla's violations of the FUDTPA.

155.    Tesla had an ongoing duty to all Tesla customers to refrain from unfair and deceptive practices under the FUDTPA.  All owners of Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Tesla's deceptive and unfair acts and practices made in the course of Tesla's business.

156.    Tesla's violations present a continuing risk to Plaintiff and the Florida class as well as to the general public.  Tesla's unlawful acts and practices complained of herein affect the public interest.

157.    As a direct and proximate result of Tesla's violations of the FUDTPA, Plaintiff and the Florida class have suffered injury-in-fact and/or actual damage.

158.    Plaintiff and the Florida class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

159.    Plaintiff also seeks an order enjoining Tesla's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

**COUNT II**

**FRAUD BY CONCEALMENT**

160.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

161.    Plaintiff Kelner brings this Count on behalf of himself and the Florida class.

162.    Tesla concealed and suppressed material facts concerning the quality of its vehicles and the Tesla brand.

163.    Tesla concealed and suppressed material facts concerning the safety, performance, and quality of the Affected Vehicles.  As alleged in this Complaint, notwithstanding its promises as to capabilities of the AP2.0 system and its anticipated delivery date, Tesla knowingly and intentionally designed and incorporated a system that would undermine safe operation of its vehicles.

164.    Tesla did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Tesla vehicles that Tesla is a reputable manufacturer that stands behind its vehicles after they are sold, and that its vehicles are safe, reliable, and perform as promised.  The false representations were material to consumers, both because they concerned the safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

165.    Plaintiff and Florida class members viewed advertising on Tesla's website and other forums that promised extensive auto-pilot and safety features.  They had no way of knowing that Tesla's representations were false and gravely misleading.  Plaintiff and Florida class members did not and could not unravel Tesla's deception on their own.

166.    Tesla had a duty to disclose the true performance of the Affected Vehicles because knowledge of the scheme and its details were known and/or accessible only to Tesla; Tesla had superior knowledge and access to the facts; and Tesla knew the facts were not known to, or

reasonably discoverable, by Plaintiff and the Florida class.  Tesla also had a duty to disclose because it made many general affirmative representations about the about the qualities of vehicles equipped with the AP2.0 system, starting with references to them as vehicles with an *auto-pilot* system, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of its vehicles, its actual decision to put sales and profits over safety, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff, Tesla had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the safety and the value of the Affected Vehicles purchased or leased by Plaintiff and the Florida class.  Whether a vehicle is safe to drive, and whether that vehicle's manufacturer tells the truth with respect to the vehicles performance and capabilities are material concerns to a consumer, as evidenced by the approximately $5,000 premium paid for Tesla vehicles equipped with the AP2.0 system.

167.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not perform as other premium vehicles on the market, which perception would hurt the brand's image and cost Tesla money, and it did so at the expense of Plaintiff and the Florida class.

168.    On information and belief, Tesla has still not made full and adequate disclosures and continues to defraud Plaintiff and the Florida class by concealing material information regarding the safety and performance of its vehicles.

169.    Plaintiff and the Florida class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the AP2.0 system-equipped vehicles manufactured by Tesla, and/or would not have continued to drive their Affected Vehicles or would have taken other affirmative steps.  Plaintiff's and the Florida class members' actions were justified.  Tesla was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Florida class.

170.    Because of the concealment and/or suppression of the facts, Plaintiff and the Florida class sustained damage because they did not receive the value for the approximately $5,000

CLASS ACTION COMPLAINT                                - 35 -
Case No.
010681-11  953105 V1

premium paid, and they own vehicles that diminished in value as a result of Tesla s concealment of, and failure to timely disclose, the actual safety and performance of Tesla vehicles with the AP2.0 system.  Had they been aware of the true safety and performance of the Affected Vehicles, Plaintiff and Florida class members who purchased or leased the Affected Vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

171.    The value of all Florida class members' Affected Vehicles has diminished as a result of Tesla's fraudulent concealment of the true capabilities of the AP2.0 system, which has greatly tarnished the Tesla brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Florida class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proven at trial.

172.    Accordingly, Tesla is liable to Plaintiff and the Florida class for damages in an amount to be proven at trial.

173.    Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Florida class members' rights and well-being, to enrich Tesla.  Tesla's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IV**

**UNJUST ENRICHMENT**

174.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

175.    In the event that no adequate legal remedy is available, Plaintiff Kelner brings this Count in the alternative on behalf of himself and the Florida class.

176.    Tesla has received and retained a benefit from Plaintiff, and inequity has resulted.

177.    Tesla has benefitted from selling and leasing defective cars whose value was artificially inflated by Tesla's concealment of the defective AP2.0 system at a profit, and Plaintiff and the Florida class have overpaid for the cars and been forced to pay other costs.

178.    Thus, all Florida class members conferred a benefit on Tesla.

179.   It is inequitable for Tesla to retain these benefits.

180.   Plaintiff and the Florida class were not aware of the true facts about the Affected Vehicles and did not benefit from Tesla's conduct.

181.   Tesla knowingly accepted the benefits of its unjust conduct.

182.   As a result of Tesla's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**C.   New Jersey**

**NEW JERSEY COUNT I**

**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**

183.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

184.   Plaintiff Tom Milone brings this action on behalf of himself and the New Jersey class and subclass ("New Jersey class") against the Tesla.

185.   Plaintiff, the New Jersey class members, and Tesla are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

186.   Tesla engaged in "sales" of "merchandise" within the meaning of N.J. Stat.§ 56:8-1(c), (e).  Tesla's actions as set forth herein occurred in the conduct of trade or commerce.

187.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."  N.J. Stat. § 56:8-2.

188.   In the course of Tesla's business, Tesla intentionally or negligently concealed and suppressed material facts concerning the capabilities and anticipated delivery date of its AP2.0 system.  Tesla accomplished this by designing and installing defective software in the Affected Vehicles and misrepresenting the delivery date for safe, functional software.  Defects in the software

package actually render Affected Vehicles unsafe to drive, as set forth herein.  The result was what Tesla intended—consumers gave it their hard-earned money for a system that did not work, and that would not be delivered consistent with its representations.  Plaintiff and New Jersey class members had no way of discerning that Tesla's representations were false and misleading because Tesla's AP2.0 system was extremely sophisticated technology and because they had no way of knowing when it actually would be ready for real-world use.  Plaintiff and New Jersey class members did not and could not unravel Tesla's deception on their own.

189.    Tesla thus violated the provisions of the New Jersey CFA, at a minimum by: (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Affected Vehicles with the intent to induce consumers to purchase or lease the Affected Vehicles; and (5) otherwise engaging in conduct likely to deceive.

190.    Tesla engaged in misleading, false, unfair. or deceptive acts or practices that violated the New Jersey CFA by installing, failing to disclose and/or actively concealing defects in its AP2.0 system; by misrepresenting the date by which this system would be ready for safe, real-world deployment; by marketing its vehicles as safe, reliable, and of high quality; and by presenting itself as a reputable manufacturer that valued safety and that stood behind its vehicles after they were sold.

191.    Tesla compounded the deception by repeatedly asserting that the Affected Vehicles were safe and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

192.    By violating federal laws, including the Motor Vehicle Safety Act and attendant regulations, and by failing to recall vehicles that contain a safety defect, Tesla violated federal law and therefore engaged in conduct that violates the New Jersey CFA.

193.    Tesla knew it had designed and installed a defective AP2.0 system in the Affected Vehicles, and it knew it could not deliver a safe AP2.0 system with the capabilities it touted, but it concealed all of that information.  Tesla also knew that it valued profits over safety and compliance

with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that violated federal law, but it concealed this information as well.

194.    Tesla intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the New Jersey class.

195.    Tesla knew or should have known that its conduct violated the New Jersey CPA.

196.    Defendant owed Plaintiff and New Jersey class members a duty to disclose, truthfully, all the facts concerning the AP2.0 system and vehicles equipped with it because it:

      a.    Possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with federal law;

      b.    Intentionally concealed the foregoing from regulators, Plaintiff, New Jersey class members; and/or

      c.    Made incomplete or negligent representations about the safety and capabilities of the Affected Vehicles, as well as the date by which a safe and capable AP2.0 system would actually be delivered, while purposefully withholding material facts from Plaintiff that contradicted these representations.

197.    Tesla fraudulently concealed the defects in the AP2.0 system and the true safety and performance of Affected Vehicles, resulting in a raft of negative publicity once Tesla's fraud was exposed.  The value of the Affected Vehicles has therefore plummeted.  In light of the stigma Tesla's misconduct attached to the Affected Vehicles, the Affected Vehicles are now worth less than they otherwise would be worth.

198.    Tesla's fraudulent behavior regarding the AP2.0 system and its concealment of the true relevant facts as described herein were material to Plaintiff and the New Jersey class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

199.    Tesla's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and New Jersey class members, about the

true safety and capabilities of Tesla-branded vehicles equipped with the AP2.0 system, the quality of the Tesla brand, and integrity at Tesla, and the true value of the Affected Vehicles.

200.    Plaintiff and New Jersey class members suffered ascertainable loss and actual damages as a direct and proximate result of Tesla's misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the New Jersey class members who purchased or leased the Affected Vehicles would not have purchased or leased them at all and/or—if the vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. Plaintiff and members of the putative New Jersey class also suffered diminished value of their vehicles, as well as lost or diminished use.

201.    Tesla had an ongoing duty to all Tesla customers to refrain from unfair and deceptive practices under the New Jersey CPA in the course of its business.

202.    Tesla's violations present a continuing risk to Plaintiff as well as to the New Jersey class and general public.  Tesla's unlawful acts and practices complained of herein affect the public interest.

203.    As a result of the foregoing wrongful conduct of Tesla, Plaintiff and the New Jersey class have been damaged in an amount to be proven at trial, and they seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining defendant's deceptive and unfair conduct, costs, and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the proposed classes, respectfully request that the Court enter judgment in their favor and against defendant, as follows:

A.      Certification of the proposed classes, including appointment of Plaintiffs' counsel as class counsel;

B.      An order temporarily and permanently enjoining Tesla  from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this complaint;

C.      Injunctive relief in the form of a  recall;

D.      Equitable relief in the form of buyback of the Affected Vehicles;

1     E.       Costs, restitution, damages, including punitive damages, penalties, and disgorgement

2 in an amount to be determined at trial;

3     F.       An order requiring Tesla to pay both pre- and post-judgment interest on any amounts

4 awarded;

5     G.       An award of costs and attorneys' fees; and

6     H.       Such other or further relief as may be appropriate.

7           **DEMAND FOR JURY TRIAL**

8     Plaintiffs hereby demand a jury trial for all claims so triable.

9

10 Dated: April 19, 2017           HAGENS BERMAN SOBOL SHAPIRO LLP

11           By */s/ Shana E. Scarlett*
            Shana E. Scarlett (SBN 217895)

12           715 Hearst Avenue, Suite 202
          Berkeley, California 94710

13           Telephone: (510) 725-3000
          Facsimile: (510) 725-3001

14           Email: shanas@hbsslaw.com

15           Steve W. Berman (*pro hac vice pending*)
          Thomas E. Loeser (SBN 202724)

16           Robert F. Lopez, (*pro hac vice pending*)
          HAGENS BERMAN SOBOL SHAPIRO LLP

17           1918 Eighth Avenue, Suite 3300
          Seattle, Washington 98101

18           Telephone: (206) 623-7292
          Facsimile: (206) 623-0594

19           Email: steve@hbsslaw.com
          Email: toml@hbsslaw.com

20           Email: robf@hbsslaw.com

21           *Attorneys for Plaintiffs and the Proposed Classes*

22

23

24

25

26

27

28