Steve W. Berman (*pro hac vice*)
Thomas E. Loeser (SBN 202724)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com
robl@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

*Attorneys for Plaintiffs and
the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DEAN SHEIKH, JOHN KELNER, TOM MILONE, DAURY LAMARCHE, DAN WHELAN, and MICHAEL VERDOLIN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>TESLA, INC. d/b/a TESLA MOTORS, INC., a Delaware corporation,<br><br>    Defendant. | No.  5:17-cv-02193-BLF<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF STATE CONSUMER FRAUD ACTS, FRAUD BY CONCEALMENT, AND UNJUST ENRICHMENT<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   JURISDICTION .........................................................................................................2

III.  VENUE .......................................................................................................................3

IV.   PARTIES ....................................................................................................................3

      A.    Colorado Plaintiff ...........................................................................................3

      B.    Florida Plaintiff ..............................................................................................4

      C.    New Jersey Plaintiffs ......................................................................................5

            1.    Tom Milone .........................................................................................5

            2.    Daury Lamarche ..................................................................................5

      D.    California Plaintiffs .........................................................................................6

            1.    Dan Whelan ..........................................................................................6

            2.    Michael Verdolin .................................................................................7

      E.    Defendant ........................................................................................................8

V.    FACTUAL ALLEGATIONS .....................................................................................9

      A.    Tesla's Marketing and Sale of Vaporware .....................................................9

            1.    Standard Safety Features .....................................................................9

            2.    New Hardware and Software ...............................................................9

      B.    Real-World Performance ...............................................................................13

            1.    Generally ...........................................................................................13

            2.    Plaintiffs' Experiences ......................................................................16

                  a.    Colorado Plaintiff Dean Sheikh ..............................................16

                  b.    Florida Plaintiff John Kelner ...................................................19

                  c.    New Jersey Plaintiff Tom Milone ...........................................21

                  d.    California Plaintiff Dan Whelan ..............................................23

      C.    Tesla's Violation of the Motor Vehicle Safety Act ......................................26

      D.    Tesla's False Advertising and Fraudulent Misrepresentations.....................26

VI.    CLASS ALLEGATIONS ...................................................................................27

VII.   CASUES OF ACTION ON BEHALF OF THE NATIONWIDE CLASS ...........................31

COUNT I  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS.
         & PROF. CODE § 17200, *ET SEQ.*).........................................................31

COUNT II  VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
          (CAL. BUS. & PROF. CODE § 1750, *ET SEQ.*)............................................33

COUNT III  VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW (CAL. BUS.
           & PROF. CODE § 17500, *ET SEQ.*)........................................................35

COUNT IV  FRAUD BY CONCEALMENT (BASED ON CALIFORNIA LAW).......................37

VIII.  CAUSES OF ACTION ON BEHALF OF THE ALTERNATE CLASSES........................40

       A.    California ...................................................................................40

COUNT I  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS.
         & PROF. CODE § 17200, *ET SEQ.*).........................................................40

COUNT II  VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
          (CAL. BUS. & PROF. CODE § 1750, *ET SEQ.*)............................................41

COUNT III  VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW (CAL. BUS.
           & PROF. CODE § 17500, *ET SEQ.*)........................................................44

COUNT IV  FRAUD BY CONCEALMENT .......................................................................45

       B.    Colorado ....................................................................................48

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
         (COLO. REV. STAT. § 6-1-101, *ET SEQ.*).................................................48

COUNT II  FRAUD BY CONCEALMENT .......................................................................51

COUNT III  UNJUST ENRICHMENT ...........................................................................54

       C.    Florida.......................................................................................54

COUNT I  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE TRADE PRACTICES
         ACT (FLA. STAT. § 501.201, *ET SEQ.*)...................................................54

COUNT II  FRAUD BY CONCEALMENT .......................................................................57

COUNT III  UNJUST ENRICHMENT ...........................................................................60

       D.    New Jersey.................................................................................60

COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT.
         ANN. § 56:8-1, *ET SEQ.*)....................................................................60

COUNT II  FRAUD BY CONCEALMENT .......................................................................64

COUNT III  UNJUST ENRICHMENT ........................................................................67

REQUEST FOR RELIEF............................................................................................67

DEMAND FOR JURY TRIAL ..................................................................................68

## I.    INTRODUCTION

1.    Tesla represents on its website that its "Model S is designed from the ground up to be the safest, most exhilarating sedan on the road. . . .   Model S comes with Autopilot capabilities designed to make your highway driving not only safer, but stress free."[1]  But most of its "Standard Safety Features" remain inoperative months after customers have taken delivery, and the Enhanced Autopilot capabilities that consumers paid $5,000 extra to obtain are anything but "safer" and "stress free"—many owners report that the Autopilot is essentially unusable and demonstrably dangerous.

2.    Regarding its Standard Safety Features, Tesla told purchasers:  "These active safety technologies, including collision avoidance and automatic emergency braking, will become available in December 2016 and roll out through over-the-air software updates."  When Tesla missed that deadline, it changed its website to state:  "These active safety technologies, including collision avoidance and automatic emergency braking, have begun rolling out through over-the-air updates."  But neither statement was or is accurate.  The Standard Safety Features were not available in December 2016; and in the months since customers have been taking deliveries of cars under these promises, only certain features, including (1) a dangerously defective Traffic Aware Cruise Control ("TACC") and (2) a limited front collision warning (initially with no auto-braking), were rolled out.  The remaining features—which are standard on many cars costing less than half the cost of a new Tesla—are absent or have only recently rolled out, and were for an extended period or remain substandard and unsafe.

3.    Tesla initially promised that the Enhanced Autopilot software was "expected to complete validation and be rolled out to your car via an over-the-air update in December 2016, subject to regulatory approval."  It missed this delivery date as well.  So then it changed its website to state that "Tesla's Enhanced Autopilot software has begun rolling out and features will continue to be introduced as validation is completed[,]" leaving the impression that only "validation" and "regulatory approval" were needed.  But what Tesla has delivered to date does not resemble what it promised.  Rather than deliver safe and advanced autopilot features, Tesla has delivered software that

---

[1] Tesla Model S webpage, https://www.tesla.com/models (last visited Apr. 19, 2017).

1    causes vehicles to behave erratically.  Contrary to what Tesla represented to them, buyers of affected

2    vehicles became beta testers of half-baked software that renders Tesla vehicles dangerous if engaged.

3         4.    Tesla's deception has resulted in economic injury to owners of its 2016-2017 models

4    that were sold with the hardware ("HW2") purportedly required for Enhanced Auto Pilot (the

5    "Affected Vehicles").  By selling vehicles with inoperative Standard Safety Features and inoperative

6    Autopilot, Tesla defrauded its customers and engaged in unfair competition.  Customers did not

7    receive the benefit of their bargain—they paid many thousands of dollars for a product they did not

8    receive.  Further, consumers such as Plaintiffs would never have bought their Tesla vehicles at all, or

9    would have paid thousands less for them, but for the promised Standard Safety Features the cars

10   were supposed to come with, and Enhanced Autopilot capabilities consumers could supposedly

11   activate in short order by purchasing Tesla's software.

12        5.    Plaintiffs bring this action individually and on behalf of all others similarly situated

13   who leased or purchased the Affected Vehicles.  Plaintiffs seek damages, injunctive relief, and

14   equitable relief for the conduct of Tesla related to the defective Standard Safety Features and

15   Enhanced Autopilot, as alleged in this complaint.  Specifically, Plaintiffs seek, at their election and

16   that of putative class members: buyback of the Affected Vehicles, including a full refund for the

17   software putative class members purchased; return of the premium paid for the Enhanced Autopilot,

18   if purchased, over the cost of the same model without Enhanced Autopilot; restitution for purchase of

19   service packages that will go unused as to cars bought back; and punitive damages, where available,

20   for Tesla's knowing fraud that garnered it illicit profits for a product suite that does not exist as

21   promised and puts drivers at risk.

22   **II.    JURISDICTION**

23        6.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of

24   2005, 28 U.S.C. § 1332(d), because the proposed classes consist of 100 or more members; the

25   amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 2 -
Case No. 5:17-cv-02193-BLF
010681-11 972323 V1

exists.  Tesla sold approximately 22,000 Model S and Model X vehicles in Q4 2016[2] and 25,000 Model S and Model X cars in Q1 2017.[3]  It is believed, and therefore alleged, that all or virtually all of these cars were equipped with inoperable Standard Safety Features, and likely at least half of these were equipped with second generation autopilot software —*i.e.*, Enhanced Autopilot 2.0 ("AP2.0" or "Enhanced Autopilot AP2.0")—costing $5,000 per vehicle.  Also, certain owners and lessees paid thousands more dollars to equip their vehicles with purported self-driving software, as alleged herein.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### III.  VENUE

7.  Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Furthermore, Tesla's principal place of business is in this judicial district, and it is believed, and therefore alleged, that a substantial amount of the conduct of which Plaintiffs complain occurred in this judicial district.  Further, Tesla has marketed, advertised, sold, and leased Affected Vehicles within this judicial district.  Additionally, the San Jose division of this Court is the proper division for filing given Tesla's headquarters in Palo Alto, California.

### IV.  PARTIES

**A.  Colorado Plaintiff**

8.  Plaintiff Dean Sheikh is a resident of Denver, Colorado.  Dean placed an order for his 2016 Model S 60 D on November 20, 2016, paying a $2,500 deposit.  On November 24, 2016, his vehicle design was confirmed with a purchase price of $81,200, inclusive of a $5,000 premium for Enhanced Autopilot.  At the time Dean placed the order for his car, Tesla's website and marketing materials indicated that the Standard Safety Features and Enhanced Autopilot features would be available in December 2016.

---

[2] Tesla Press Release, *Tesla Q4 2016 Production and Deliveries* (Jan. 3, 2017), http://ir.tesla.com/releasedetail.cfm?releaseid=1006161.

[3] Christian Prenzler, *Tesla delivers a record 25,000 Model S, X in Q1 2017, 69% increase over Q1 2016*, TESLARATI (Apr. 2, 2017), https://www.teslarati.com/tesla-delivers-record-25000-model-s-x-q1-2017-69-increase-q1-2016/.

9.      Plaintiff Sheikh took delivery of his 2016 Model S 60 D on December 27, 2016.  At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-functioning.  At times pertinent to this Complaint, Enhanced Autopilot has been non-functioning or unsafe to use, and only a front collision warning from the promised suite of Standard Safety Features was enabled.

10.     Plaintiff Sheikh has been directly harmed by Tesla's actions as described in this complaint because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle did not have; and (2) he paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

**B.      Florida Plaintiff**

11.     Plaintiff John Kelner is a resident of Davie, Florida.  John visited the Tesla showroom on December 10, 2016, and picked out the car that he wanted, a 2016 Model S 90 D.  While at the showroom, he placed an order through Tesla's online system and paid his initial $2,500 deposit on a credit card.  On December 14, 2016, John paid a $24,333.57 initial lease payment.  His vehicle design was confirmed with a purchase price of $108,700.00, inclusive of a $5,000 premium for Enhanced Autopilot.  At the time John placed the order for his car, Tesla's website and marketing materials indicated that the Standard Safety Features and Enhanced Autopilot features would be available in December 2016.

12.     Plaintiff Kelner took delivery of his Tesla on December 16, 2016.  At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-functioning.  At times pertinent to this Complaint, Enhanced Autopilot has been non-functioning or unsafe to use, and only a front collision warning from the promised suite of Standard Safety Features was enabled.

13.     Plaintiff Kelner has been directly harmed by Tesla's actions as described in this complaint because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle did not have; and (2) he paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

**C.      New Jersey Plaintiffs**

   **1.      Tom Milone**

   14.      Plaintiff Tom Milone is a resident of Jackson, New Jersey.  Tom placed an order for his 2016 Model S 90 D on November 23, 2016, paying a $2,500 deposit.  His vehicle design was confirmed with a purchase price of $113,200.00, inclusive of a $5,000 premium for Enhanced Autopilot and a $3,000 premium for "Full Self-Driving Capability."  At the time Tom placed the order for his car, Tesla's website and marketing materials indicated that the Standard Safety Features and Enhanced Autopilot features would be available in December 2016.

   15.      Plaintiff Milone took delivery of his Tesla on December 29, 2016.  At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-functioning.  At times pertinent to this Complaint, Enhanced Autopilot has been non-functioning or unsafe to use, and only a front collision warning from the promised suite of Standard Safety Features was enabled.

   16.      Plaintiff Milone has been directly harmed by Tesla's actions as described in this complaint because: (1) he paid the list price for a vehicle that was advertised to have Standard Safety Features that the vehicle did not have; and (2) he paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

   **2.      Daury Lamarche**

   17.      Plaintiff Daury Lamarche is a 36-year-old resident of Marlton, New Jersey.  In the fall of 2016, Daury saw the video of Tesla's self-driving demonstration on the Tesla website, which convinced him that it was the car for him.  Daury placed an order for a 2016 Model S 75 D based entirely on the information and promises on Tesla's website, including that the AP2.0 software and features would roll out in December 2016, and he paid a $2,500 deposit.  Daury spoke with a sales representative named Woody from the King of Prussia, Pennsylvania Tesla store to coordinate the deposit and confirm the ordering procedure.

   18.      The Standard Safety Features and Enhanced Autopilot features were especially important to Plaintiff Lamarche because he has a 170-mile roundtrip commute.  He contacted Woody and asked whether the AP2.0 car he was ordering would have at least AP1.0 functionality on delivery.  Woody said that he would find out and respond, but he did not do so.  In November 2016,

Daury went to test drive a Tesla at the Devon store, but they did not have an AP2.0 car and instead provided him with a car equipped with the AP1.0 system. Daury was very impressed with the functionality of the Tesla he drove, which cemented his desire to follow through with a purchase.

19.     On December 3, 2016, Daury changed his order to a specific Model S 75 D that was already made and that matched the features he wanted, including the Enhanced Autopilot. Tesla switched his $2,500 deposit to the purchase of the "inventory" car.

20.     Plaintiff Lamarche's vehicle design was confirmed on December 3, 2016, with a purchase price of $94,950, inclusive of a $5,000 premium for Enhanced Autopilot.

21.     Plaintiff Lamarche took delivery of his 2016 Model S 75 D on December 14, 2016. At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-functioning. At times pertinent to this complaint, the Enhanced Autopilot has been non-functioning or unsafe to use, and only a front collision warning from the promised suite of Standard Safety Features was enabled. While front collision warning from the promised suite of Standard Safety Features has been enabled, the other safety features only work under limited conditions (*i.e.*, under freeway speed for auto-braking) and operate sporadically and unsafely. Daury was willing to purchase this extraordinarily expensive vehicle primarily because of the safety and autopilot features, all of which worked in the car he test drove in November 2016.

22.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have; and (2) he paid an additional $5,000 premium for an Autopilot system that does not operate as advertised and is unsafe to use.

**D.     California Plaintiffs**

**1.     Dan Whelan**

23.     Plaintiff Dan Whelan is a 71-year-old resident of Mill Valley, California. Dan placed an order for his 2016 Model S 60 on October 25, 2016, paying a $2,500 deposit. His vehicle design was confirmed with a purchase price of $82,450, inclusive of a $5,000 premium for Enhanced Autopilot. Dan also ordered and paid $3,000 for Tesla's Full Self Driving ("FSD") software. At the

1    time Dan placed the order for his car, Tesla's website and marketing materials indicated that the

2    Standard Safety Features and Enhanced Autopilot features would be available in December 2016.

3         24.    Plaintiff Whelan took delivery of his 2016 Model S 60 D on December 8, 2016.  At

4    the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were non-

5    functioning.  As of today, Enhanced Autopilot remains non-functioning or unsafe to use, and only a

6    front collision warning from the promised suite of Standard Safety Features has been enabled.

7         25.    Plaintiff has been directly harmed by Tesla's actions as described in this complaint

8    because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that the

9    vehicle does not have; and (2) he paid an additional $5,000 premium for an Enhanced Autopilot

10   AP2.0 system that does not operate as advertised and is unsafe to use.

11        **2.    Michael Verdolin**

12        26.    Plaintiff Michael Verdolin is a resident of Chula Vista, California.  Michael placed an

13   order for his 2016 Model X P100D on June 26, 2016, paying a $2,500 deposit.  His vehicle design

14   was confirmed on July 3, 2016, with a purchase price of $146,950, inclusive of a $2,500 premium for

15   Autopilot.  Michael test drove and sought to purchase his vehicle with the Autopilot AP1.0 system,

16   which Michael found to work well in terms of safety features and autopilot features.  After Michael's

17   order had been placed, Tesla repeatedly contacted him with requests that he take a six- or seven-seat

18   car instead of the five-seat car that he ordered.  Michael declined to do so, as he wanted the car

19   configured as he had ordered it.  When Michael was told his car was ready, he learned that it would

20   be delivered with the Autopilot AP2.0 system instead of the AP1.0 system that he had tested and

21   approved.  At the time Michael was informed of this "upgrade," Tesla's website and marketing

22   materials indicated that the Standard Safety Features and Enhanced Autopilot features would be

23   available in December 2016.  Michael was directed to communications from Tesla CEO Elon Musk,

24   which indicated that AP2.0 would have "parity" with AP1.0 in December 2016.

25        27.    Plaintiff Verdolin took delivery of his 2016 Model X P100 D on December 23, 2016.

26   At the time of delivery, the Standard Safety Features of the car and the Enhanced Autopilot were

27   non-functioning.  Michael was very dissatisfied that his car had not been delivered with the AP1.0

28   system he ordered and the AP2.0 system simply did not work.  He repeatedly attempted to get Tesla

to either activitate features at parity with the system he ordered or take back his car.  Tesla refused to do either.  At times pertinent to this complaint, Enhanced Autopilot has been non-functioning or unsafe to use, and only a front collision warning from the promised suite of Standard Safety Features was enabled.  And while front collision warning from the promised suite of Standard Safety Features has been enabled, the other safety features only work under limited conditions (*i.e.*, under freeway speed for auto-braking) and operate sporadically and unsafely.  Michael was willing to purchase this extraordinarily expensive vehicle primarily because of the safety and autopilot features, all of which worked in the car he test drove in June 2016.

28.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because: (1) he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have; and (2) he paid an additional $2,500 premium for an Autopilot system that does not operate as advertised and is unsafe to use.

**E.     Defendant**

29.     Tesla, Inc. d/b/a Tesla Motors, Inc. is a Delaware corporation.  As stated above, its principal place of business is located in Palo Alto, California.  On information and belief, through Tesla's publicly filed financial reports and its website, Tesla's design, testing, and manufacturing of Affected Vehicles occurs at its headquarters and elsewhere in California.  In addition, Tesla's advertising, promotional materials, and website are designed and emanate from California.  Finally, the promotional video shown on Tesla's website purporting to show the operation of the Enhanced Autopilot system was filmed and created in California on California roadways.

30.     Tesla has a system of company-owned Tesla dealerships in states throughout the United States, via which it distributes, markets, advertises, and sells Tesla-branded goods and vehicles.

31.     Tesla's authorized dealerships are tightly controlled by Tesla and are the agents of Tesla.  Tesla controls the marketing practices of Tesla-authorized dealerships, the repair facilities within those dealerships, and even the appearance of said dealerships.  This control emanates from Tesla's California headquarters.  Additionally, Tesla trains the personnel at Tesla-authorized dealerships.

32.     At all times relevant to this action, Tesla designed, manufactured, marketed, distributed, sold, leased, and warranted the Affected Vehicles, including the Enhanced Autopilot AP2.0 system, under the Tesla brand name in California and sold Affected Vehicles by and through its dealerships.  Tesla also designed, manufactured, and installed the defective AP2.0 system in the Affected Vehicles.  Tesla also developed and disseminated advertisements and other promotional materials relating to the Affected Vehicles and, more specifically, to its Standard Safety Features and Enhanced Autopilot AP2.0 system in California.

## V.     FACTUAL ALLEGATIONS

### A.     Tesla's Marketing and Sale of Vaporware

33.     As Dictionary.com states, vaporware is "[c]omputer software that is advertised but still nonexistent."  Tesla advertised vaporware to consumers, knowing full well that this particular come-on would particularly excite its target market of high-tech aficionados.

#### 1.     Standard Safety Features

34.     Tesla's website describes its "Standard Safety Features" to include: (1) Automatic Emergency Braking; (2) Front Collision Warning; (3) Side Collision Warning; and (4) Auto High Beams.[4]  Customers who ordered their cars from approximately mid-October 2016 through mid-January 2017 were told these features would "become available in December 2016 and roll out through over-the-air software updates."  In mid-January 2017, Tesla modified its website to state: "These active safety technologies, including collision avoidance and automatic emergency braking, have begun rolling out through over-the-air updates."  Many customers, including Plaintiffs in this action, were shocked to discover these features did not exist when they picked up their cars.  Since delivery, some of the Standard Safety Features have been enabled under certain driving conditions, but even now their operation is below standard for luxury cars in this price range and far below what Tesla promised purchasers when they bought their cars.

#### 2.     New Hardware and Software

35.     On October 19, 2016, Tesla stated in a blog post:

---

[4] *See* Tesla Autopilot webpage, https://www.tesla.com/autopilot (last visited Apr. 19, 2017).

> We are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver.  Eight surround cameras provide 360 degree visibility around the car at up to 250 meters of range.  Twelve updated ultrasonic sensors complement this vision, allowing for detection of both hard and soft objects at nearly twice the distance of the prior system.  A forward-facing radar with enhanced processing provides additional data about the world on a redundant wavelength, capable of seeing through heavy rain, fog, dust and even the car ahead.
>
> To make sense of all of this data, a new onboard computer with more than 40 times the computing power of the previous generation runs the new Tesla-developed neural net for vision, sonar and radar processing software.  Together, this system provides a view of the world that a driver alone cannot access, seeing in every direction simultaneously and on wavelengths that go far beyond the human senses.[5]

36.     Tesla's website filled in some details.  Shortly after Tesla's October 19, 2016 announcement, its website stated:  "All Tesla vehicles produced in our factory, including Model 3, have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver."[6]  It also advised that consumers would need to pay $5,000 more (at the time of ordering, or $6,000 thereafter) to unlock software that would activate the "Enhanced Autopilot" aspect of the new hardware.

37.     On or about October 20, 2016, the day after it announced its new hardware features, Tesla posted a video to its website that gave a demonstration of certain self-driving features made possible by HW2.  That video continues to be available on Tesla's website.[7]

38.     Shortly thereafter, on or about November 18, 2016, Tesla presented another self-driving video on its website.  When consumers pushed the "Learn More" button under the statement "All Tesla vehicles produced in our factory, including Model 3, have the hardware needed for full

---

[5] Tesla, *All Tesla Cars Being Produced Now Have Full Self-Driving Hardware* (Oct. 19, 2016), https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-self-driving-hardware.

[6] Tesla Design webpage, available at http://web.archive.org/web/20161022202131/ https://www.tesla.com/models/design (capture from Oct. 22, 2016) (last visited Mar. 20, 2017).

[7] Tesla, *Full Self-Driving Hardware on All Teslas*, https://www.tesla.com/videos/full-self-driving-hardware-all-tesla-cars (last visited Apr. 19, 2017).

self-driving capability at a safety level substantially greater than that of a human driver," they first would be invited to see a video lasting over two minutes, in which the initial frames shouted:  "THE PERSON IN THE DRIVER'S SEAT IS ONLY THERE FOR LEGAL REASONS.  HE IS NOT DOING ANYTHING.  THE CAR IS DRIVING ITSELF."  The video, presented at a sped-up rate, shows a Tesla driving by itself to a destination a good distance away, taking a path replete with curves, much vehicular traffic, pedestrians, stop signs, and turns.  The car self-parks at the end of the route.  It's a remarkable piece of salesmanship for the car's newly enhanced hardware and software that was only available on Tesla vehicles.

39.    Underneath this video, Tesla presented (and presents) consumers with descriptions of the newly enhanced hardware installed on its latest models.  The descriptions speak to eight "surround cameras," twelve "updated ultrasonic sensors," and radar, too.  They also speak to "a new onboard computer with over 40 times the computing power of the previous generation" as well as a new "neural net for vision, sonar and radar processing software."

40.    But getting the system to come to life required customers to pay an extra $5,000 for Tesla's Enhanced Autopilot software system.[8]  According to Tesla's summary:

> Enhanced Autopilot adds these new capabilities to the Tesla Autopilot driving experience.  Your Tesla will match speed to traffic conditions, keep within a lane, automatically change lanes without requiring driver input, transition from one freeway to another, exit the freeway when your destination is near, self-park when near a parking spot and be summoned to and from your garage.

> Tesla's Enhanced Autopilot software is expected to complete validation and be rolled out to your car via an over-the-air update in December 2016, subject to regulatory approval.[9]

41.    Thus, if consumers pushed the "Order Now" button between approximately October 22, 2016, and at least through January 23, 2017,[10] they would see as an option for purchase:

---

[8] The customer could activate even more features if he paid thousands of dollars extra to activate Tesla's "Full Self-Driving Capability" software system.  *See, e.g.*, Tesla Design webpage, https://www.tesla.com/modelx/design (current page for Model X vehicle, describing this system) (last visited Apr. 19, 2017).

[9] Tesla autopilot webpage, available at http://web.archive.org/web/20170123045718/ https://www.tesla.com/autopilot (capture from Jan. 23, 2017) (last visited Mar. 20, 2017).

1

**Enhanced Autopilot**

2

Enhanced Autopilot adds new capabilities to the Tesla Autopilot
driving experience. The enhancements include going from one to four
cameras for greater accuracy, redundancy, and to see fast-approaching
vehicles in adjacent lanes. In addition, 12 ultrasonic sonar sensors
provide 360 degree coverage around your car with almost twice the
range and resolution of the prior version.

3

4

5

6

The significantly increased sensor information is processed by a
computer that is over 40 times more powerful than before. Your Tesla
will match speed to traffic conditions, keep within a lane,
automatically change lanes without requiring driver input, transition
from one freeway to another, exit the freeway when your destination is
near, self-park when near a parking spot and be summoned to and from
your garage. That said, Enhanced Autopilot should still be considered
a driver's assistance feature with the driver responsible for remaining in
control of the car at all times.

7

8

9

10

11

12

*Tesla's Enhanced Autopilot software is expected to complete
validation and be rolled out to your car via an over-the-air update in
December 2016, subject to regulatory approval.*[11]

13

14        42.        The website stated (and continues to state) that Enhanced Autopilot is available for

15    $5,000 if ordered pre-delivery, or $6,000 if ordered later.

16        43.        Customers like Plaintiffs found themselves unable to resist Tesla's marketing pitches.

17    They purchased cars that they believed had (or at least by the end of December 2016 would have) the

18    Standard Safety Features that Tesla touted, and they also believed Tesla's representations as to

19    Enhanced Autopilot features and what to expect regarding delivery.

20        44.        But they were deceived. Real-world performance shows that the software needed to

21    actually implement the Standard Safety Features and Enhanced Autopilot was nowhere near ready

22    for the vital tasks for which it was sold. This is not simply a matter of Tesla missing the December

23    2016 roll-out timeline it marketed for its Standard Safety Features and Enhanced Autopilot software

24

25        [10] *See* Tesla autopilot webpage, available at http://web.archive.org/web/20170123043328/
26    https://www.tesla.com/autopilot (capture from Jan. 23, 2017) (last visited Mar. 20, 2017).

27        [11] Tesla design webpage, available at http://web.archive.org/web/20161022202131/
      https://www.tesla.com/models/design (capture from Oct. 22, 2016) (last visited Mar. 20, 2017)
28    (emphasis added).

(which would be deceptive enough).  Nor is this a matter of merely waiting for "regulatory approval."  Instead, the actual behavior of cars equipped with the new hardware and software combination speaks to Tesla's deceptiveness.

45.     Tesla had to know how deeply flawed, raw, and untested the software was and remains.  In fact, new vehicles equipped with Tesla's newest software *still* do not have some of the basic safety features that are standard features of cars equipped with the older software—and that are supposed to be standard features of Tesla's newest vehicles, too.  Yet Tesla promised imminent safety-enhanced and auto-driving nirvana.

**B.     Real-World Performance**

**1.     Generally**

46.     Tesla has not released truly functional software for its Standard Safety Features or Enhanced Autopilot.  A February 27, 2017 article at Jalopnik.com, an automobile-enthusiast website, described a Tesla equipped with Autopilot 2.0[12]—a combination of Tesla's new hardware and software—behaving as if a drunk driver is at the wheel:

> The video from Tesla owner "Scott S." shows his Model S driving with Autosteer and Traffic-aware cruise control (TACC) engaged while driving.  It doesn't go well.  At times, the car veers toward curbs and merges across the double yellow line.  Scott wrote in the comment section that he has driven that particular road at least 30 times, making the Autopilot failure seem even more strange.[13]

The accompanying video in fact shows the vehicle behaving in a highly dangerous manner.  And "Scott," the subject of the article, attributes all of this to software issues rather than any sort of need

---

[12] Hereafter, including in the Violations Alleged, Plaintiffs, unless the context indicates otherwise, refer to the software suite that enables the Standard Safety Features and the optional Enhanced Autopilot features as AP2.0.  *See* Jordon Golson, *Tesla says focus on safety is driving the step-by-step Autopilot 2 rollout*, THE VERGE (Jan. 23, 2017), http://www.theverge.com/2017/1/23/14351764/tesla-autopilot-2-rollout-self-driving-safety ("Tesla CEO Elon Musk calls the new sensor suite 'HW2,' an acronym for second-generation hardware, and the software is called AP2.  Tesla considers the entire suite of safety and driver assist features to be the Autopilot Safety Features, though the Autosteer and traffic-aware cruise control features are what most people consider 'Autopilot.'").

[13] Ryan Felton, *Watch Tesla Autopilot 2.0 Drive Like A Drunk Old Man*, JALOPNIK (Feb. 27, 2017), http://jalopnik.com/watch-tesla-autopilot-2-0-drive-like-a-drunk-old-man-1792785936.

to calibrate cameras (a notion suggested by Tesla's CEO Elon Musk).  Scott advises that he owns two AP2.0 Teslas and suggests that both are exhibiting the same behavior, rendering it highly unlikely that the exact same calibration issue would be present on both vehicles.  *Id.*  Indeed, Mr. Musk himself has stated only that "*[s]ome* cars will require adjustment of camera pitch angle by service."  *Id.* (emphasis added).

47.     Another online article, this one published at Backchannel.com and dated March 3, 2017, described a Tesla with AP2.0 "zig-zagging wildly across the road," eliciting scared shouts from the driver's wife.[14]  That driver also describes a situation where "[y]ou can be sailing along at 50 mph and the radar spots [an approaching] bridge and immediately slams on the brakes."  "The other extreme is that you approach a stoplight with a car already stopped, and the Tesla doesn't apply the brakes at all," said the driver.  "It's really a pretty scary experience," he said.  "If you'd ridden in the car with my wife, you would know how many times she's screamed to turn it off."

48.     In this same article, Tesla admits that the software is in beta phase.  But this was not communicated on Tesla's website or its promotional materials before or at the time of purchase.  And while the software seems to be improving due to the data collected by way of human testers, such as those featured in this article, it may be that there are fundamental flaws in the software:

> It's an open question how many of the system's glitches stem from insufficient testing, versus more entrenched flaws in its underlying design.  "Having a wealth of data is incredibly powerful but the [software] is also massively important and very difficult," says Karl Iagnemma, CEO of NuTonomy, a provider of AI systems for self-driving cars.  "The algorithmic element is often something that can't be sped up simply by having access to more data—it's a process of painstaking development."[15]

---

[14] Mark Harris, *Tesla Drivers Are Paying Big Bucks to Test Flawed Self-Driving Software*, BACKCHANNEL (Mar. 3, 2017), https://backchannel.com/tesla-drivers-are-guinea-pigs-for-flawed-self-driving-software-c2cc80b483a.

[15] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT - 14 -
Case No. 5:17-cv-02193-BLF
010681-11 972323 V1

49.     This difficulty with the software is no doubt the reason why Enhanced Autopilot cars were only using one to two of the eight available cameras for some time (if not currently).[16]  One would think that this would mean that AP2.0 cars are at least at parity with older cars equipped with the former Autopilot system, which only had one camera, but this would be wrong.  In Plaintiffs' and many consumers' and commentators' views, Tesla is still seeking parity with those older cars, which are regularly used during test drives in order to sell customers on the AP2.0 system.  This practice plainly was meant to foster the impression that AP2.0 would work at least as well as AP1.0 out of the gate, but that impression was false—and Tesla, which operates its own dealerships, plainly knew it.

50.     After all, Tesla has not disclosed to buyers such as Plaintiffs that it actually was starting over from scratch with its AP2.0 system and not building on the AP1.0 system at all.  Tesla lost the right to use that older software as the basis for AP2.0.  As the Backchannel.com article explains:

> Mobileye, the Israeli company that supplied the original camera and software for Autopilot, cited safety concerns when it pulled out of its partnership with Tesla.  The company's chief technology officer told Reuters that Tesla was "pushing the envelope in terms of safety … [Autopilot] is not designed to cover all possible crash situations in a safe manner."  Tesla says the collaboration ended for commercial reasons.[17]

Whether Tesla can replicate even what the Mobileye system could do was (and remains) a dangerously open question, yet Tesla purposely gave consumers the impression that Enhanced Autopilot would be available on their cars as of December 2016, and effective self-driving in a host

---

[16] Raphael Orlove, *Clever Owner Uses Tape To Discover Nearly All Of Tesla's New Cameras Do Nothing*, JALOPNIK (Feb. 28, 2017), http://jalopnik.com/clever-owner-uses-tape-to-discover-nearly-all-of-teslas-1792825392.  One report concerning the March 29, 2017 roll-out of version 8.1 software for Tesla cars reports that the software is now using two of the eight on board cameras, purportedly improving the Enhanced Autopilot (AP2.0), but not yet to the level of the original autopilot (AP1.0) features.  *See* Fred Lambert, *Tesla's Autopilot 2.0 is now using 2 out of 8 cameras with the new update*, ELECTREK (Mar. 30, 2017), https://electrek.co/2017/03/30/tesla-autopilot-2-0-camera-8-1-update/.

[17] Mark Harris, *Tesla Drivers Are Paying Big Bucks to Test Flawed Self-Driving Software*, BACKCHANNEL (Mar. 3, 2017), https://backchannel.com/tesla-drivers-are-guinea-pigs-for-flawed-self-driving-software-c2cc80b483a.

of situations would be theirs, but only if they paid an additional $5,000 to secure the Enhanced Autopilot functionality.

51.     What is more, Tesla was far behind at least one self-driving competitor in terms of real-world testing of AP2.0 even as it began selling it to consumers with the promise that it soon would perform as advertised.[18]  While that competitor had logged "635,000 fully autonomous miles in California last year, with just 124 hand-offs to safety drivers," Tesla "reported zero autonomous miles in 2015, and *only 550* miles in 2016—during which a safety driver had to take control of the car 182 times." *Id.* (emphasis added).  This comparison, too, speaks to Tesla's fundamental deceptiveness in the marketing and sale of AP2.0.

### 2.     Plaintiffs' Experiences

#### a.     Colorado Plaintiff Dean Sheikh

52.     Plaintiff Dean Shiekh was first introduced to Tesla cars when his wife was searching for a replacement to her 2006 BMW X3 in November 2016.  Dean and his wife looked at the Tesla Model X but ultimately decided against it due to the falcon doors.  The door design prohibits a ski rack on top, which Dean and his wife needed in Denver.

53.     Dean was not in the market for a new car for himself, as he owned a low mileage 2013 Audi A7 (27k miles).  However, Dean really liked Tesla's Autopilot (AP1.0) feature on the car he test drove.  When Dean learned from Tesla's marketing materials that the new cars would come with an improved version (Enhanced Autopilot AP2.0) and an option to upgrade to Full Self Drive, Dean became very interested.

54.     All of the marketing materials that Dean saw in mid-November 2016 indicated that Enhanced Autopilot would be available by the end of December 2016 and would include all the function of AP1.0 plus many other functions, including the ability to change from one highway to another based on navigation input, and the ability to be upgraded to Full Self Driving when the software was approved by regulators.

---

[18] *See, e.g., id.*

55.    After test driving the AP1.0 car, Dean found and watched Tesla's FSD video that was on its website.[19]  This video significantly influenced Dean's decision to buy the Tesla Model S 60 D.

56.    Only in March 2017, long after he had purchased his car, Dean learned that this video was patently misleading.  The video states in the beginning that the driver is only there for legal reasons and was not providing any input.  Dean learned from online sources that the driver provided input hundreds of times and that the video was simply pieced together and actually footage took days to tape.  Dean came to understand that editing made it look like Tesla had a working Full Self Drive prototype that was primarily ready and just waiting for regulatory approval.  But that was not true; Dean now believes that Tesla has no such prototype.

57.    When Dean ordered his Tesla Model S 60 D in late November 2016, the order form stated the following:  "Tesla's Enhanced Autopilot software is expected to complete validation and be rolled out to your car via an over-the-air update in December 2016 subject to regulatory approval."

58.    When Dean picked up his vehicle on December 27, 2016, the website made the same claim and the staff at the Tesla dealership confirmed that the software update was due "in a few days."

59.    It was not disclosed to Dean that the Standard Safety Features on his car would be inoperable, or that AP2.0 would be delivered slowly, over the course of months, or even years.  Dean understood Tesla's clear statement that that EAP would be rolled out via "an" over-the-air update. Dean understood "an update" to mean a single update available in December 2016 that would render the Standard Safety Features and Enhanced Autopilot fully operational.

60.    Dean understood and relied upon Tesla's marketing materials and order form that states that the EAP "adds new capabilities to the Tesla Auotpilot driving experience."  Dean later learned that the Tesla Autopilot experience (AP1.0) was withdrawn by its primary supplier, Mobileye.  Tesla's EAP does not add to AP1.0—it replaces the system that Dean test drove.

---

[19] Tesla, Inc., *Autopilot Full Self-Driving Hardware (Neighborhood Long)*, available at https://vimeo.com/192179727 (last visited Apr. 19, 2017).

61.     Dean believed Tesla's marketing materials and expected EAP to safely "change lanes without requiring driver input, transition from one freeway to another, [and] exit the freeway when your destination is near."  But none of this was available on his car when he took delivery and none of these features existed as of the initial filing of his complaint.  There is no set time table that has been disclosed for any of those options.

62.     Dean also believed that the Standard Safety Features would be available on his car when delivered, or at least sometime in December 2016, as promised.  But When Dean filed his complaint, Dean's car only had a rudimentary front collision warning.  It did not have the rest of these features, including Automatic Emergency Braking (AEB).  Recently, the AEB has been enabled, but its functionality is not reliable.  Dean had no intention to buy a car that did not have Automatic Emergency Braking; it was standard on his prior Audi A7 and was a "must have" on Dean's feature list for a new car.  Dean is still waiting for Tesla to deliver on the promised features that drove his purchase.

63.     In or about February 2017, an over-the-air update was sent to Dean's car by Tesla. This update allowed Dean to engage the Enhanced Autopilot on his car.  However, once engaged, the system operated in an unpredictable manner, sometimes veering out of lanes, lurching, slamming on the brakes for no reason, and failing to slow or stop when approaching other vehicles and obstacles. This rendered the Enhanced Autopilot system unsafe to operate.  The suite of Standard Safety Features that Dean was promised remain unsafe or inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers, and auto high beams.

64.     On or about March 30, 2017, a second over-the-air update was sent to Dean's car by Tesla.  According to Tesla, this update allowed the TACC to operate at speeds up to 80 mph and purportedly improved the functionality of the Enhanced Autopilot and the Standard Safety Features. But the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no reason, and fails to brake when approaching large vehicles like trucks and buses.  The Enhanced Autopilot remains less capable than the original autopilot that it replaced, and in any event places Plaintiff, and all drivers and occupants of Tesla vehicles, at risk of serious injury or death.

65.     Dean reports that when using the auto-steer function on local roads, the car will consistently cross double solid lines and move into the lane for traffic coming the opposite direction. This happens even at low speed (20 mph) with gentle turns.

66.     When using TACC, the car will brake on the highway for no apparent reason.  It appears to see overhead signs and bridges as vehicles and will sometimes slam on the brakes, leaving the driver at risk of being rear-ended.

67.     TACC often does not see buses directly ahead of Dean's car.  On April 3, 2017, Dean was following a bus, which was moving in front of him at speeds from 5 mph to 25 mph.  The sensor display on Dean's Tesla showed nothing in front of the car the entire time.  Had Dean turned on the TACC, the car would have run into the bus without human intervention.  Later that week, TACC was engaged when approaching a slow moving bus.  TACC did not attempt to brake.  Dean had to make an aggressive brake to avoid a collision.

68.     The Enhanced Autopilot Features are simply too dangerous to be used, and are therefore completely useless notwithstanding the $5,000 premium that Dean paid for Enhanced Autopilot.

69.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have.  As a result, he did not get the benefit of the bargain he struck, and his car is necessarily worth less than he paid for it because it does not have the Standard Safety Features.  In addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

**b.     Florida Plaintiff John Kelner**

70.     Plaintiff John Kelner took delivery of his Tesla Model S 90 D on December 16, 2016. The price included Tesla's Standard Safety Features, and John paid $5,000 extra for the Enhanced Autopilot.

71.     One year earlier, on December 24, 2015, the Tesla dealer had given John a 2015 Model S with the original version of autopilot for an extended test drive.  John drove the car from Ft.

Lauderdale to Jupiter, Florida (about 2.5 hours each way).  John loved the car.  The car was equipped with the original version of Autopilot, which functioned safely, including the Autosteer and TACC features.  Naturally, John believed that a newer 2016 version, with an Enhanced Autopilot (including more cameras and sensors) would work even better.

72.     On his way home from the dealership, John attempted to engage the Enhanced Autopilot, but nothing happened.  There was no TACC, no Autosteer, no Automatic Emergency Braking, no auto-sensing wipers, and no auto high-beams.  Simply put, none of the safety features that were supposed to be "standard" were on his car, and none of the Enhanced Autopilot features worked.

73.     On or about February 2017, an over-the-air update was sent to Plaintiff Kelner's car by Tesla.  This update allowed John to engage the Enhanced Autopilot on his car.  However, once engaged, the system operated in an unpredictable manner, sometimes veering out of lanes, lurching, slamming on the brakes for no reason, and failing to slow or stop when approaching other vehicles and obstacles.  This rendered the Enhanced Autopilot system unsafe to operate.  The suite of Standard Safety Features that John was promised remain unsafe, unreliable, or inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers and auto high beams.

74.     On or about March 30, 2017, a second over-the-air update was sent to John's car by Tesla.  According to Tesla, this update allowed the TACC to operate at speeds up to 80 mph and purportedly improved the functionality of the Enhanced Autopilot and the Standard Safety Features.  However, the Standard Safety Features that John was promised remained unsafe, unreliable or inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers and auto high beams.  In addition, the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no reason, and fails to brake when approaching large vehicles like trucks and buses.  The Enhanced Autopilot remains less capable than the original autopilot that it replaced, and in any event places drivers and occupants of Tesla vehicles at risk of serious injury or death.

75.     John's car should, in fact, have the Standard Safety features that he paid for, and he should have obtained a functional Enhanced Autopilot—at least one as good as the one on the car he drove a year earlier—for the $5,000 premium that he paid to obtain it.

76.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because he paid the list price for a vehicle that was advertised to have Standard Safety Features that the vehicle did not have.  As a result, he did not get the benefit of the bargain he struck, and his car is necessarily worth less than he paid for it because it did not have the Standard Safety Features.  In addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

### c.     New Jersey Plaintiff Tom Milone

77.     When starting to shop for a new vehicle, Plaintiff Milone watched the Tesla video online that many of Tom's friends were talking about.  It showed a Tesla Model S that can drive itself, and it is still on the Tesla website.[20]  Tom understood the video to explain that a driver was just in the vehicle for legal purposes and that this vehicle could drive anyone from point A to B and even let the occupants out and go park itself.  The website even mentioned that using a self-driving Tesla for car sharing and ride hailing for friends and family would be fine and details on the ride sharing would be released next year.

78.     Tom was amazed at the video and noticed that all literature he had seen said that these features would be released December 2016.  Having a sick mother-in-law that always needed to be picked up and brought to doctor appointments, food stores, etc., Tom thought he would have great use of this full self-driving system.  Tom thought at the time that Autopilot and the advertised safety features were available because they were selling the features already.

79.     On November 21, 2016, Tom paid a deposit on a new Model S with Enhanced AutoPilot ($5,000) and the FSD ($3,000).

80.     Tom picked up his Tesla Model S on December 29th and was very excited to begin to use all the promised Standard Safety Features and the Autopilot.  At the time of delivery, Tesla's website showed the Enhanced Auto Pilot and safety features would be rolled out by December 2016.  Tom attempted to use the Enhanced Autopilot, but nothing happened.  There was no TACC, no

---

[20] Tesla Autopilot webpage, https://www.tesla.com/autopilot (last visited Apr. 19, 2017).

SECOND AMENDED CLASS ACTION COMPLAINT - 21 -
Case No. 5:17-cv-02193-BLF
010681-11 972323 V1

Autosteer, no Automatic Emergency Braking, no auto-sensing wipers, and no auto high-beams. Simply put, none of the safety features that Tesla promised as "standard" were on his car, and none of the Enhanced Autopilot features worked. Tom waited patiently for the features that he paid for, but they were never enabled. As of the filing of this complaint, Tom still has not received the functionality that he paid for.

81.     While Tesla has released some updates to enable some AutoPilot functions, the system is nowhere near what was presented to Tom in Tesla's promotional material. Tom still does not have safe, reliable, or operable Automatic Emergency Braking, side collision warnings, Auto High Beams or Auto Windshield Wipers. The AutoPilot system that is available is limited to only highways and the system is not very stable. It does not see large objects such as trucks, and if a lane line fades the vehicle veers off to the side of the road. This rendered the Autopilot system unsafe to operate. The system falls far short of Tom's expectations based upon Tesla's promises.

82.     When Tom ordered his Tesla, he believed and relied on Tesla's website and promotional materials that promised a suite of "Standard Safety Features" and "Enhanced Autopilot." Tom believed Tesla when it promised these features would be available in December 2016.

83.     On or about March 30, 2017, a second over-the-air update was sent to Tom's car by Tesla. According to Tesla, this update allowed the TACC to operate at speeds up to 80 mph and purportedly improved the functionality of the Enhanced Autopilot and the Standard Safety Features. However, the Standard Safety Features that Tom was promised remain unsafe, unreliable or inoperable, including Automatic Emergency Braking, side collision warnings, auto-wipers and auto high beams. In addition, the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no reason, and fails to brake when approaching large vehicles like trucks and buses. The Enhanced Autopilot remains less capable than the original autopilot that it replaced, and in any event places drivers and occupants of Tesla vehicles at risk of serious injury or death.

84.     Tom's car should, in fact, have the Standard Safety features that he paid for, and he should have obtained a functional Enhanced Autopilot for the $5,000 premium that he paid to obtain it.

85.     Plaintiff has been directly harmed by Tesla's actions as described in this complaint because he paid the list price for a vehicle that was advertised to have Standard Safety Features that the vehicle does not have.  As a result, he did not get the benefit of the bargain he struck, and his car is necessarily worth less than he paid for it because it does not have the Standard Safety Features.  In addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000 premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe to use.

### d.     California Plaintiff Dan Whelan

86.     Dan Whelan had been interested in Electric Vehicles (EVs) for many years and had been closely watching Tesla's development.  Dan owned three Toyota Priuses because he believed in the hybrid idea long before Tesla came on the market with their all-electric cars.  Dan learned about Tesla from reading all of their press releases online.  Dan also visited Tesla's design website many times to "build" his dream car.

87.     Dan waited to place an order because he wanted to have the Enhanced Autopilot System and hardware for eventual full self-driving capability, which Tesla had indicated would not be released until the end of 2016.  Soon after these features became available for purchase, on October 25, 2016, Dan ordered his Tesla Model S 60.

88.     Dan saw video demonstrations of how enhanced autopilot and self-driving worked on the Tesla website.  Dan also read the Tesla promotions online about how safe the new enhanced autopilot system would be because Tesla had added many more cameras and an improved radar detection system.  Dan believed the representations on Tesla's website and from its employees that the Standard Safety Features and a functional Enhanced Autopilot System would be released by the end of 2016.  These features were particularly important to Dan since, as a 71-year-old driver, he could foresee a time when assistance from these features would make him safer on the road.

89.     All of the marketing materials that Dan saw prior to the delivery of his car to him on December 8, 2016, indicated that Enhanced Autopilot would be available by the end of December 2016 and would include all the function of AP1.0 plus many other functions, including the ability to

change from one highway to another based on navigation input, and the ability to be upgraded to Full Self Driving when the software was approved by regulators.

90.     When Dan ordered his Tesla Model S 60 in late October 2016, the order form stated the following:  "Tesla's Enhanced Autopilot software is expected to complete validation and be rolled out to your car via an over-the-air update in December 2016 subject to regulatory approval."

91.     When Dan picked up his vehicle on December 8, 2016, the website made the same claim and the staff at the Tesla dealership confirmed that the software update was due as planned at the end of that month.

92.     It was not disclosed to Dan that the Standard Safety Features on his car would be inoperable, or that AP2.0 would be delivered slowly, over the course of months, or even years.

93.     Dan understood and relied upon Tesla's marketing materials and order form that states that the Enhanced Autopilot "adds new capabilities to the Tesla Autopilot driving experience." Dan later learned that the Tesla Autopilot experience (AP1.0) was withdrawn by its primary supplier, Mobileye.

94.     Dan believed Tesla's marketing materials and expected the Enhanced Autopilot to safely "change lanes without requiring driver input, transition from one freeway to another,[and] exit the freeway when your destination if near."  But none of this was available on his car when he took delivery and none of these features are reliably operable now.

95.     Dan also believed that the Standard Safety Features would be available on his car when delivered, or at least sometime in December 2016, as promised.  But that also did not happen. Instead, there has been a piecemeal roll-out of various features with varying degrees of reliability. To the extent operable, many of the features are not reliable and not safe.

96.     To date, Dan's Tesla S is still missing many of the key software programs that were promised to him, and many of the software releases that Tesla has offered have been in "beta" mode. Worse yet, the autopilot features Dan has tried in his car were totally unsafe and, in Dan's opinion, could have resulted in accidents or injury if Dan hadn't taken immediate control of his Tesla. Specifically, the "auto-steering" and the "lane-holding" features of the Enhanced Autopilot system are unusable and dangerous in their present form.  When engaged in Dan's neighborhood, the

1   Enhanced Autopilot started jerking the steering wheel, then moving the Tesla in and out of the road

2   lanes, In Dan's words, like a drunk was driving the car.  The car then steered Dan in the direction of

3   the curb and parked cars.

4   97.    Dan does not trust his Tesla to autopilot him anywhere, and has no faith that the

5   purported future "self-driving" features will ever operate safely as was promised him when he

6   purchased the car.  Dan had hoped that his Tesla would be able to take over many "driving

7   functions" for him when he needed assistance sometime in the near future.  And Dan's wife, who is

8   having problems with night vision, was really looking forward to the Enhanced Autopilot features,

9   which cost Dan a $5,000 premium.  Now, Dan's wife is too afraid to drive the Tesla at any time.

10   98.    Dan feels that his trust has been broken with Tesla because Tesla over-promised and

11   delivered an incomplete and unsafe product to him.  The suite of Standard Safety Features that Dan

12   was promised remains unsafe, unreliable, or inoperable, including Automatic Emergency Braking,

13   side collision warnings, auto-wipers, and auto high beams.

14   99.    Over-the-air updates have been sent to Dan's car by Tesla.  According to Tesla, the

15   most recent update allowed the TACC to operate at speeds up to 80 mph and purportedly improved

16   the functionality of the Enhanced Autopilot and the Standard Safety Features.  However, the

17   Standard Safety Features that Dan was promised remain unsafe, unreliable or inoperable, including

18   Automatic Emergency Braking, side collision warnings, auto-wipers, and auto high beams.  In

19   addition, the Enhanced Autopilot remains unsafe to use as it continues to brake unexpectedly for no

20   reason, and fails to brake when approaching large vehicles like trucks and buses.  The Enhanced

21   Autopilot remains less capable than the original autopilot that it replaced, and in any event places

22   Plaintiff, and all drivers and occupants of Tesla vehicles, at risk of serious injury or death.

23   100.    The Enhanced Autopilot Features are simply too dangerous to be used, and are

24   therefore completely useless notwithstanding the $5,000 premium that Dan paid for Enhanced

25   Autopilot.

26   101.    Plaintiff has been directly harmed by Tesla's actions as described in this complaint

27   because he paid for a vehicle that was advertised to have Standard Safety Features that the vehicle

28   does not have.  As a result, he did not get the benefit of the bargain he struck, and his car is

necessarily worth less than he paid for it because it does not have the Standard Safety Features.  In

addition, Plaintiff has been directly harmed by Tesla because Plaintiff paid an additional $5,000

premium for an Enhanced Autopilot AP2.0 system that does not operate as advertised and is unsafe

to use.

**C.     Tesla's Violation of the Motor Vehicle Safety Act**

102.    Based on the foregoing, Tesla has violated the Motor Vehicle Safety Act (the "Act").

103.    That Act requires immediate action when a manufacturer determines or should

determine that a safety defect exists.  *United States v. General Motors Corp.*, 574 F. Supp. 1047,

1050 (D.D.C. 1983).  A safety defect is defined by regulation to include any defect that creates an

"unreasonable risk of accidents occurring because of the design, construction, or performance of a

motor vehicle" or "unreasonable risk of death or injury in an accident."  49 U.S.C. § 30102(a)(8).

Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a

description of the vehicles potentially containing the defect, including "make, line, model year, [and]

the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from

similar vehicles not included in the recall, and "a summary of all warranty claims, field or service

reports, and other information" that formed the basis of the determination that the defect was safety-

related.  49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c).  Then, "within a reasonable time" after

deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.

49 C.F.R. §§ 577.5(a), 577.7(a).  Violating these notification requirements can result in a maximum

civil penalty of $15,000,000.  49 U.S.C. § 30165(a)(1).

104.    Tesla vehicles equipped with AP2.0 have safety defects, as described above.  Yet

Tesla has not complied with its obligations under the Act.  Certainly Plaintiffs have received no

notice that they were sold a defective vehicle.

**D.     Tesla's False Advertising and Fraudulent Misrepresentations**

105.    Tesla marketed AP2.0 via its website and through its company-owned-and-operated

dealerships.

106.    Putative class members paid large premiums to purchase and lease the Affected

Vehicles.  Had Tesla disclosed that its "Standard Safety Features" were completely inoperable upon

delivery, and—except for front collision warning—are as yet still unavailable, it would not have been able to command the extraordinarily high base price of its cars.

107.    Customers had to pay an extra $5,000 for cars equipped with the Enhanced Autopilot AP2.0 software.  The difference in the MSRP of vehicles with and without AP2.0 software directly and proportionally increased the agreed-upon cash value of the vehicles, which directly and proportionally increased the monthly lease and/or purchase, interest, and tax payments.  Class members were harmed from the day they drove their Affected Vehicle off the lot because they did not get that for which they paid.

108.    In addition, many putative class members purchased extended service agreements for their Affected Vehicles because they intended to own the vehicles for many years beyond the initial warranty.  However, as a result of the unavailability of the Standard Safety Features, and inoperability of the Enhanced Autopilot AP2.0 system, class members no longer want to own the Affected Vehicles; accordingly, they have lost the value of the extended warranties that they purchased.

109.    As a result of Tesla's unfair, deceptive, and/or fraudulent business practices, owners and lessees of the Affected Vehicles, including the Plaintiffs, have suffered losses in money and/or property.  Had Plaintiffs and putative class members known of the lack of Standard Safety Features and the AP2.0 inoperability and defects at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased their vehicles at all, or they would have paid substantially less for the vehicles than they did, and/or they would not have paid the $5,000 premium for Enhanced Autopilot AP2.0 software.

## VI.    CLASS ALLEGATIONS

110.    Plaintiffs bring this action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed class:

> **Nationwide Class**
>
> All persons or entities who purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**Nationwide Enhanced Autopilot Subclass**

All members of the Nationwide class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

111.    As an alternative Class, if California law does not apply to all owners of Affected Vehicles, Plaintiffs bring this action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

**California Class**

All persons or entities who, in the state of California, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**California Enhanced Autopilot Subclass**

All members of the California class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

**Colorado Class**

All persons or entities who, in the state of Colorado, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**Colorado Enhanced Autopilot Subclass**

All members of the Colorado class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

**Florida Class**

All persons or entities who, in the state of Florida, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**Florida Enhanced Autopilot Subclass**

All members of the Florida class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

**New Jersey Class**

All persons or entities who, in the state of New Jersey, purchased or leased a Tesla Model S or Model X vehicle that was equipped with the hardware necessary for use of Enhanced Autopilot (AP2.0).

**New Jersey Enhanced Autopilot Subclass**

All members of the New Jersey class who, in connection with the purchase of their Tesla, purchased the Enhanced Autopilot software option.

112.    Excluded from the proposed classes are Tesla, its employees, officers, directors, legal representatives, heirs, successors, wholly or partly owned, and its subsidiaries and affiliates, Tesla dealers, and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons who make a timely election to be excluded from the proposed classes.

113.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

114.    This action has been brought and may be properly maintained on behalf of the classes proposed herein under Federal Rule of Civil Procedure 23.

115.    <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the classes proposed herein are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable.  While Plaintiffs believe that there are thousands of members of the proposed classes, the precise number of class members is unknown to them, but may be ascertained from Tesla's books and records.  Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

116.    <u>Commonality and Predominance</u>.  Federal Rule of Civil Procedure 23(a)(2) and (b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

    a.    Whether Tesla engaged in the conduct alleged herein;

b.     Whether Tesla designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

c.     Whether the Affected Vehicles contain one or more safety defects, including the inoperability of the Standard Safety Features and Enhanced Autopilot;

d.     Whether Tesla knew about the defect(s), and, if so, for how long;

e.     Whether Tesla designed, manufactured, marketed, and distributed Affected Vehicles and the AP2.0 system;

f.     Whether Tesla's conduct violates consumer protection statutes, false advertising laws, sales contracts, and other laws as asserted herein;

g.     Whether Plaintiffs and proposed class members overpaid for their Affected Vehicles and the AP2.0 system;

h.     Whether Plaintiffs and other putative class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

i.     Whether Plaintiffs and other putative class members are entitled to damages and other monetary relief and, if so, in what amount.

117.     <u>Typicality</u>.  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Tesla's wrongful conduct as described above.

118.     <u>Adequacy</u>.  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate proposed class representatives because their interests do not conflict with the interests of the other members of the proposed classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the proposed classes will be fairly and adequately protected by Plaintiffs and their counsel.

119.     <u>Declaratory and Injunctive Relief</u>.  Federal Rule of Civil Procedure 23(b)(2):  Tesla have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of

the proposed classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed classes as a whole.

120.    <u>Superiority</u>.  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Tesla, so it would be impracticable for the members of the proposed classes to individually seek redress for Tesla's wrongful conduct.  Moreover, even if class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, as well as comprehensive supervision by a single court.

## VII.    CASUES OF ACTION ON BEHALF OF THE NATIONWIDE CLASS

### COUNT I

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)

121.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

122.    Plaintiffs bring this count on behalf of themselves and the Nationwide Class and Nationwide Enhanced Autopilot Subclass ("Nationwide class").

123.    California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

124.    Tesla's conduct, as described herein, was performed in and emanated from California, and is in violation of the UCL.  Tesla's conduct violates the UCL in at least the following ways:

a.   By knowingly and intentionally concealing from Plaintiffs and the other class members that the Affected Vehicles suffer from a design defect while obtaining money from Plaintiffs and the class;

b.   By marketing Affected Vehicles and the AP2.0 systems as possessing functional, or near-functional, and defect-free Standard Safety Features;

c.   By marketing Affected Vehicles and the AP2.0 systems as possessing functional, or near-functional, and defect-free Enhanced Autopilot;

d.   By violating federal laws, including the Motor Vehicle Safety Act and attendant regulations, and by failing to recall vehicles that contain a safety defect; and

e.   By violating other California laws, including California laws governing false advertising and consumer protection.

125.   Tesla's misrepresentations and omissions alleged herein, which emanated from its headquarters in California, caused Plaintiffs and putative class members to make their purchases or leases of their Affected Vehicles, including the AP2.0 system.  Absent these misrepresentations and omissions, Plaintiffs and the other class members would not have purchased or leased these vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective AP2.0 software.

126.   Accordingly, Plaintiffs and other putative Nationwide class members have suffered injury in fact, including lost money or property, as a result of Tesla's misrepresentations and omissions.

127.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Tesla under CAL. BUS. & PROF. CODE § 17200.

128.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Tesla from continuing its unfair, unlawful, and/or deceptive practices as described herein, and to restore to Plaintiffs and members of the Nationwide class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 and 3345; and for such other relief as is set forth below.

# COUNT II

## VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### (CAL. BUS. & PROF. CODE § 1750, *et seq.*)

129.    Plaintiffs reallege and incorporates by reference all paragraphs as though fully set forth herein.

130.    Plaintiffs bring this count on behalf of themselves and the Nationwide class.

131.    California's Consumers Legal Remedies Act ("CLRA"), CAL. BUS. & PROF. CODE § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

132.    The Affected Vehicles, as well as the Enhanced Autopilot AP2.0 system, are "goods" as defined in CAL. BUS. & PROF. CODE § 1761(a).

133.    Plaintiffs and other putative Nationwide class members are "consumers" as defined in CAL. BUS. & PROF. CODE § 1761(d), and Plaintiffs, the other class members, and Tesla are "persons" as defined in CAL. BUS. & PROF. CODE § 1761(c).

134.    As alleged above, Tesla made numerous representations concerning the benefits, performance, and safety features of the Affected Vehicles and the Enhanced Autopilot AP2.0 system, and vehicles equipped with it, that were misleading, all of which emanated from Tesla's headquarters in California.

135.    In purchasing or leasing the Affected Vehicles, Plaintiffs and other putative Nationwide class members were deceived by Tesla's failure to disclose that the Standard Safety Features in the Affected Vehicles were inoperable and, when sold with the Enhanced Autopilot, were equipped with a defective Enhanced Autopilot AP2.0 system.

136.    Tesla's conduct as described herein was and is in violation of the CLRA.  Tesla's conduct emanates entirely from its headquarters in California and violates at least the following enumerated CLRA provisions:

        a.    CAL. CIV. CODE § 1770(a)(2):  Misrepresenting the approval or certification of goods;

b.    CAL. CIV. CODE § 1770(a)(5):  Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

c.    CAL. CIV. CODE § 1770(a)(7):  Representing that goods are of a particular standard, quality, or grade, if they are of another;

d.    CAL. CIV. CODE § 1770(a)(9):  Advertising goods with intent not to sell them as advertised; and

e.    CAL. CIV. CODE § 1770(a)(16):  Representing that goods have been supplied in accordance with a previous representation when they have not.

137.    Tesla knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Affected Vehicles and the Enhanced Autopilot AP2.0 system, and that the Affected Vehicles were not suitable for their intended use.

138.    The facts concealed and omitted by Tesla in its interactions with Plaintiffs and the other putative class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiffs and other class members known about the defective nature of the Affected Vehicles, they would not have purchased or leased the Affected Vehicles, or they would not have paid the prices they paid, including the $5,000 premium for the Enhanced Autopilot AP2.0 system.

139.    Plaintiffs and the Class have provided Tesla with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).  The notice was transmitted to Tesla on April 25, 2017.

140.    In accordance with CAL. CIV. CODE § 1780(a), Plaintiffs and members of the Subclass seek injunctive relief for Tesla's violations of the CLRA.

141.    Plaintiffs, having transmitted appropriate notice and demand in accordance with CAL. CIV. CODE § 1782(a) & (d), now request compensatory and punitive damages because Plaintiffs and other putative California class members have suffered injury in fact and actual damages resulting from Tesla's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Affected Vehicles and because the inoperable, unsafe and unreliable nature of the Standard Safety Features and AP2.0 render the cars worth less than they would be worth if these systems were delivered as promised.

SECOND AMENDED CLASS ACTION COMPLAINT - 34 -
Case No. 5:17-cv-02193-BLF
010681-11 972323 V1

142.    Plaintiffs seek an additional award against Tesla, under CAL. CIV. CODE § 1780(b), of up to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Plaintiff Dan Whelan was 71 years old at the time of this complaint.  Tesla knew or should have known that its conduct was directed to one or more class members like Plaintiff Whelan who are senior citizens or disabled persons.  Tesla's conduct caused Plaintiff Whelan and additional senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more proposed class members who are senior citizens or disabled persons are substantially more vulnerable to Tesla's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Tesla's conduct.

143.    Plaintiffs further seek an order enjoining Tesla's unfair or deceptive acts or practices, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

**COUNT III**

**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**
(CAL. BUS. & PROF. CODE § 17500, *et seq.*)

144.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

145.    Plaintiffs bring this Count on behalf of themselves and the Nationwide class.

146.    CAL. BUS. & PROF. CODE § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

147.    Tesla caused to be made or disseminated throughout California and the United States, through advertising, marketing, and other publications emanating from its headquarters in California, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Tesla, to be untrue and misleading to consumers, including Plaintiffs and other putative class members.

148.    Tesla has violated CAL. BUS. & PROF. CODE § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Affected Vehicles, as set forth in this complaint, were material and likely to deceive a reasonable consumer.

149.    Plaintiffs and other putative Nationwide class members have suffered an injury in fact, including the loss of money or property, as a result of Tesla's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Affected Vehicles, Plaintiffs and other putative class members relied on the misrepresentations and/or omissions of Tesla with respect to the safety, performance, and reliability of the Affected Vehicles, including representations as to the Standard Safety Features and the Enhanced Autopilot AP2.0 system.  Tesla's representations turned out not to be true because the Affected Vehicles are distributed with faulty, defective, and inoperable Standard Safety Features and faulty, defective, unsafe, and inoperable Enhanced Autopilot AP2.0 systems, rendering essential vehicle functions erratic and dangerous.  Had Plaintiffs and other class members known this, they would not have purchased or leased their Affected Vehicles, or paid a $5,000 premium for the Enhanced Autopilot AP2.0 system, and/or paid as much for them.  Accordingly, Plaintiffs and other putative Nationwide class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

150.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Tesla's business, which is headquartered and has its principal operations in California. Tesla's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, which emanates from California and occurs both in the state of California and nationwide.

151.    Plaintiffs, individually, and on behalf of other putative class members, request that this Court enter such orders or judgments as may be necessary to enjoin Tesla from continuing its

unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other putative class members any money Tesla acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT IV**

**FRAUD BY CONCEALMENT**
**(BASED ON CALIFORNIA LAW)**

152.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

153.    Plaintiffs bring this count on behalf of themselves and the Nationwide class.

154.    Tesla concealed and suppressed material facts concerning the quality of its vehicles and the Tesla brand.

155.    More specifically, Tesla concealed and suppressed material facts concerning the design, safety, performance, and quality of the Affected Vehicles, the Standard Safety Features, and its Enhanced Autopilot AP2.0 system.  As alleged in this Complaint, notwithstanding its promises regarding Standard Safety Features and its Enhanced Autopilot AP2.0 system, Tesla knowingly and intentionally designed and incorporated Standard Safety Features that simply did not exist at the time of purchase and delivery of Affected Vehicles and do not presently exist.  In addition, Tesla sold and installed in Affected Vehicles an Enhanced Autopilot AP2.0 system that it knew was unsafe to use and would impair the safe operation of the vehicle.

156.    Tesla did so in order to boost sales of its vehicles and in order to falsely assure purchasers and lessees of Tesla vehicles that Tesla is a reputable manufacturer and that Tesla's vehicles and self-driving system are safe, reliable, and able to perform as promised.  The false representations were material to consumers, both because they concerned the safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

157.    Plaintiffs and proposed Nationwide class members viewed advertising on Tesla's website (which was designed and implemented in California), read promotional materials, and heard Tesla dealer sales pitches that promised Standard Safety Features comparable to those in other similarly priced luxury vehicles and safe Enhanced Autopilot capabilities if they also purchased

1    Tesla's expensive Enhanced Autopilot AP2.0.  They had no way of knowing that Tesla's

2    representations were false and gravely misleading.  Plaintiffs and class members did not and could

3    not unravel Tesla's deception on their own.

4            158.    Tesla had a duty to disclose the true safety features and performance of its Affected

5    Vehicles, and the Enhanced Autopilot AP2.0 system, because knowledge of the scheme and its

6    details were known and/or accessible only to Tesla; Tesla had superior knowledge and access to the

7    facts; and Tesla knew the facts were not known to, or reasonably discoverable by, Plaintiffs and

8    members of the putative class. Tesla also had a duty to disclose because it made many general

9    affirmative representations about the about the safety and qualities of the Affected Vehicles and the

10   Enhanced Autopilot AP2.0 system, as set forth above, which were misleading, deceptive, and

11   incomplete without the disclosure of: (a) the additional facts set forth above regarding the actual

12   performance of these vehicles and Enhanced Autopilot AP2.0 software; (b) its actual decision to put

13   sales and profits over safety; and (c) its actual practices with respect to the vehicles and system at

14   issue.  Having volunteered to provide information to Plaintiffs and the proposed class, Tesla had the

15   duty to disclose not merely the partial truth, but the entire truth.  These omitted and concealed facts

16   were material because they directly impact the safety and the value of the Affected Vehicles

17   purchased or leased by Plaintiffs and the Nationwide class.  Whether a vehicle is safe to drive, and

18   whether that vehicle's manufacturer tells the truth with respect to the vehicle's real abilities, are

19   material concerns to a consumer, as evidenced by the exorbitant base prices of Affected Vehicles

20   ($72,000–$135,000+) and $5,000 premium paid for Tesla vehicles equipped with the Enhanced

21   Autopilot AP2.0 system.

22           159.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to

23   pad and protect its profits and to burnish the perception that its vehicles were at the leading edge of

24   safety and autopilot technology, which perception would enhance the brand's image and garner Tesla

25   more money.  But it did so at the expense of Plaintiffs and the class.

26           160.    On information and belief, Tesla still has not made full and adequate disclosures and

27   continues to defraud Plaintiffs and the class by concealing material information regarding the safety

28   and performance of Affected Vehicles and the Enhanced Autopilot AP2.0 system.

1

2      161.    Plaintiffs and the class were unaware of these omitted material facts and would not

3  have acted as they did if they had known of the concealed and/or suppressed facts, in that they would

4  not have purchased Affected Vehicles manufactured by Tesla, would not have paid the $5,000

5  premium for Enhanced Autopilot AP2.0, and/or would not have continued to drive their Affected

6  Vehicles or would have taken other affirmative steps.  Plaintiffs' and the class members' actions

7  were justified.  Tesla was in exclusive control of the material facts, and such facts were not known to

   the public, Plaintiffs, or the class.

8      162.    Because of the concealment and/or suppression of the facts, Plaintiffs and the class

9  sustained damage because they did not receive the value for: (1) the base purchase price of their

10 Affected Vehicles, which were supposed to have been equipped with functional Standard Safety

11 Features by December 2016, but were not so equipped; and (2) the $5,000 premium paid for

12 Enhanced Autopilot functionality when that functionality was not available as promised in December

13 2016, and remains unavailable to this day.  Had Plaintiffs and members of the class been aware of

14 the grave safety issues attendant to, and the real-world performance of, the Affected Vehicles and

15 Tesla's Enhanced Autopilot AP2.0 system, Plaintiffs and fellow putative class members who

16 purchased or leased the Affected Vehicles would have paid less for their vehicles and the Enhanced

17 Autopilot AP2.0 system, or they would not have purchased or leased them at all.

18     163.    Accordingly, Tesla is liable to Plaintiffs and the proposed Nationwide class for

19 damages in an amount to be proven at trial.

20     164.    Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud,

21 and in reckless disregard of Plaintiffs' and the class members' rights and well-being, and as part of

22 efforts to enrich itself in California at the expense of consumers.  Tesla's conduct warrants an

23 assessment of punitive damages in an amount sufficient to deter such conduct in the future, which

24 amount is to be determined according to proof.

25

26

27

28

# VIII.   CAUSES OF ACTION ON BEHALF OF THE ALTERNATE CLASSES

A.      **California**

## COUNT I

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)

165.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

166.    Plaintiffs Whelan and Verdolin bring this count on behalf of themselves and the alternative California Class and California Enhanced Autopilot Subclass ("California class").

167.    California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

168.    Tesla's conduct, as described herein, was and is in violation of the UCL.  Tesla's conduct violates the UCL in at least the following ways:

        a.      By knowingly and intentionally concealing from Plaintiffs and the other class members that the Affected Vehicles suffer from a design defect while obtaining money from Plaintiffs and the class;

        b.      By marketing Affected Vehicles and the AP2.0 systems as possessing functional, or near-functional, and defect-free Standard Safety Features;

        c.      By marketing Affected Vehicles and the AP2.0 systems as possessing functional, or near-functional, and defect-free Enhanced Autopilot;

        d.      By violating federal laws, including the Motor Vehicle Safety Act and attendant regulations, and by failing to recall vehicles that contain a safety defect; and

        e.      By violating other California laws, including California laws governing false advertising and consumer protection.

169.    Tesla's misrepresentations and omissions alleged herein caused Plaintiffs and putative class members to make their purchases or leases of their Affected Vehicles, including the AP2.0 system.  Absent these misrepresentations and omissions, Plaintiffs and the other class members would not have purchased or leased these vehicles, would not have purchased or leased these

Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective AP2.0 software.

170.    Accordingly, Plaintiffs and other putative California class members have suffered injury in fact, including lost money or property, as a result of Tesla's misrepresentations and omissions.

171.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Tesla under CAL. BUS. & PROF. CODE § 17200.

172.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Tesla from continuing its unfair, unlawful, and/or deceptive practices, and to restore to Plaintiffs and members of the class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 & 3345; and for such other relief as is set forth below.

**COUNT II**

**VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT**
**(CAL. BUS. & PROF. CODE § 1750, *et seq.*)**

173.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

174.    Plaintiffs Whelan and Verdolin bring this count on behalf of themselves and the California class.

175.    California's Consumers Legal Remedies Act ("CLRA"), CAL. BUS. & PROF. CODE § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

176.    The Affected Vehicles, as well as the Enhanced Autopilot AP2.0 system, are "goods" as defined in CAL. BUS. & PROF. CODE § 1761(a).

177.    Plaintiffs and other putative California class members are "consumers" as defined in CAL. BUS. & PROF. CODE § 1761(d), and Plaintiffs, the other class members, and Tesla are "persons" as defined in CAL. BUS. & PROF. CODE § 1761(c).

178.     As alleged above, Tesla made numerous representations concerning the benefits, performance, and safety features of the Affected Vehicles and the Enhanced Autopilot AP2.0 system, and vehicles equipped with it, that were misleading.

179.     In purchasing or leasing the Affected Vehicles, Plaintiffs and other putative California class members were deceived by Tesla's failure to disclose that the Standard Safety Features in the Affected Vehicles were inoperable and, when sold with the Enhanced Autopilot, were equipped with a defective Enhanced Autopilot AP2.0 system.

180.     Tesla's conduct as described herein was and is in violation of the CLRA.  Tesla's conduct violates at least the following enumerated CLRA provisions:

a.     CAL. CIV. CODE § 1770(a)(2):  Misrepresenting the approval or certification of goods;

b.     CAL. CIV. CODE § 1770(a)(5):  Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

c.     CAL. CIV. CODE § 1770(a)(7):  Representing that goods are of a particular standard, quality, or grade, if they are of another;

d.     CAL. CIV. CODE § 1770(a)(9):  Advertising goods with intent not to sell them as advertised; and

e.     CAL. CIV. CODE § 1770(a)(16):  Representing that goods have been supplied in accordance with a previous representation when they have not.

181.     Tesla knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Affected Vehicles and the Enhanced Autopilot AP2.0 system, and that the Affected Vehicles were not suitable for their intended use.

182.     The facts concealed and omitted by Tesla in its interactions with Plaintiffs and the other putative class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiffs and other class members known about the defective nature of the Affected Vehicles, they would not have purchased or leased the Affected Vehicles, or they would not have paid the prices they paid, including the $5,000 premium for the Enhanced Autopilot AP2.0 system.

183.    Plaintiffs and the Class have provided Tesla with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).  The notice was transmitted to Tesla on April 25, 2017.

184.    In accordance with CAL. CIV. CODE § 1780(a), Plaintiffs and members of the Subclass seek injunctive relief for Tesla's violations of the CLRA.

185.    Plaintiffs and the Class seek to recover damages under the CLRA in this Complaint, having mailed appropriate notice and demand in accordance with CAL. CIV. CODE § 1782(a) & (d). Plaintiffs request compensatory and punitive damages because Plaintiffs and other putative California class members have suffered injury in fact and actual damages resulting from Tesla's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Affected Vehicles and the fact that the vehicles are equipped with unsafe, unreliable, or inoperable Standard Safety Features and AP2.0 renders them worth less than they would be worth if these systems operated as promised.

186.    Plaintiffs seek an additional award against Tesla, under CAL. CIV. CODE § 1780(b), of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Plaintiff Dan Whelan was 71 years old at the time of this complaint. Tesla knew or should have known that its conduct was directed to one or more California class members like Plaintiff who are senior citizens or disabled persons.  Tesla's conduct caused Plaintiffs and additional senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more proposed California class members who are senior citizens or disabled persons are substantially more vulnerable to Tesla's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Tesla's conduct.

187.    Plaintiffs further seek an order enjoining Tesla's unfair or deceptive acts or practices, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

**COUNT III**

**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**
(CAL. BUS. & PROF. CODE § 17500, *et seq.*)

188.    Plaintiffs reallege and incorporates by reference all paragraphs as though fully set forth herein.

189.    Plaintiffs Whelan and Verdolin bring this Count on behalf of themselves and the California class.

190.    CAL. BUS. & PROF. CODE § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

191.    Tesla caused to be made or disseminated throughout California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Tesla, to be untrue and misleading to consumers, including Plaintiffs and other putative class members.

192.    Tesla has violated CAL. BUS. & PROF. CODE § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Affected Vehicles, as set forth in this complaint were material and likely to deceive a reasonable consumer.

193.    Plaintiffs and other putative California class members have suffered an injury in fact, including the loss of money or property, as a result of Tesla's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Affected Vehicles, Plaintiffs and other putative class members relied on the misrepresentations and/or omissions of Tesla with respect to the safety, performance, and reliability of the Affected Vehicles, including representations as to the Standard Safety Features and the Enhanced Autopilot.  Tesla's representations turned out not to be true

because the Affected Vehicles are distributed with faulty, defective, and inoperable Standard Safety Features and faulty, defective, unsafe, and inoperable Enhanced Autopilot AP2.0 systems, rendering essential vehicle functions erratic and dangerous.  Had Plaintiffs and other class members known this, they would not have purchased or leased their Affected Vehicles, or paid a $5,000 premium for the Enhanced Autopilot AP2.0 system, and/or paid as much for them.  Accordingly, Plaintiffs and other putative California class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

194.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Tesla's business.  Tesla's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

195.    Plaintiffs, individually, and on behalf of other putative California class members, request that this Court enter such orders or judgments as may be necessary to enjoin Tesla from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other putative class members any money Tesla acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT IV**

**FRAUD BY CONCEALMENT**

196.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

197.    Plaintiffs Whelan and Verdolin bring this count on behalf of themselves and the California class.

198.    Tesla concealed and suppressed material facts concerning the quality of its vehicles and the Tesla brand.

199.    More specifically, Tesla concealed and suppressed material facts concerning the design, safety, performance, and quality of the Affected Vehicles, the Standard Safety Features, and its Enhanced Autopilot AP2.0 system.  As alleged in this Complaint, notwithstanding its promises regarding Standard Safety Features and its Enhanced Autopilot AP2.0 system, Tesla knowingly and intentionally designed and incorporated Standard Safety Features that simply did not exist at the time

of purchase and delivery of Affected Vehicles and do not presently exist.  In addition, Tesla sold and installed in Affected Vehicles an Enhanced Autopilot AP2.0 system that it knew was unsafe to use and would impair the safe operation of the vehicle.

200.    Tesla did so in order to boost sales of its vehicles and in order to falsely assure purchasers and lessees of Tesla vehicles that Tesla is a reputable manufacturer and that Tesla's vehicles and self-driving system are safe, reliable, and able to perform as promised.  The false representations were material to consumers, both because they concerned the safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

201.    Plaintiffs and proposed California class members viewed advertising on Tesla's website, read promotional materials, and heard Tesla dealer sales pitches that promised Standard Safety Features comparable to those in other similarly priced luxury vehicles and safe Enhanced Autopilot capabilities if they also purchased Tesla's expensive Enhanced Autopilot AP2.0.  They had no way of knowing that Tesla's representations were false and gravely misleading.  Plaintiffs and California class members did not and could not unravel Tesla's deception on their own.

202.    Tesla had a duty to disclose the true safety features and performance of its Affected Vehicles, and the Enhanced Autopilot AP2.0 system, because knowledge of the scheme and its details were known and/or accessible only to Tesla; Tesla had superior knowledge and access to the facts; and Tesla knew the facts were not known to, or reasonably discoverable by, Plaintiffs and members of the putative California class.  Tesla also had a duty to disclose because it made many general affirmative representations about the about the safety and qualities of Affected Vehicles and the Enhanced Autopilot AP2.0 system, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of: (a) the additional facts set forth above regarding the actual performance of these vehicles and Enhanced Autopilot AP2.0 software; (b) its actual decision to put sales and profits over safety; and (c) its actual practices with respect to the vehicles and system at issue.  Having volunteered to provide information to Plaintiffs and the proposed California class, Tesla had the duty to disclose not merely the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the safety and the value of the Affected Vehicles purchased or leased by Plaintiffs and the California Class.  Whether a vehicle is safe to

drive, and whether that vehicle's manufacturer tells the truth with respect to the vehicle's real abilities, are material concerns to a consumer, as evidenced by the exorbitant base prices of Affected Vehicles ($72,000–$135,000+) and $5,000 premium paid for Tesla vehicles equipped with the Enhanced Autopilot AP2.0 system.

203.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to burnish the perception that its vehicles were at the leading edge of safety and autopilot technology, which perception would enhance the brand's image and garner Tesla more money.  But it did so at the expense of Plaintiffs and the California class.

204.    On information and belief, Tesla still has not made full and adequate disclosures and continues to defraud Plaintiffs and the California class by concealing material information regarding the safety and performance of Affected Vehicles and the Enhanced Autopilot AP2.0 system.

205.    Plaintiffs and the California class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased Affected Vehicles manufactured by Tesla, would not have paid the $5,000 premium for Enhanced Autopilot AP2.0, and/or would not have continued to drive their Affected Vehicles or would have taken other affirmative steps.  Plaintiffs' and the California class members' actions were justified.  Tesla was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or the California class.

206.    Because of the concealment and/or suppression of the facts, Plaintiffs and the California class sustained damage because they did not receive the value for: (1) the base purchase price of their Affected Vehicles, which were supposed to have been equipped with functional Standard Safety Features by December 2016, but were not so equipped; and (2) the $5,000 premium paid for Enhanced Autopilot functionality when that functionality was not available as promised in December 2016, and, even if operable, remains unsafe and unreliable to this day.  Had Plaintiffs and members of the California class been aware of the grave safety issues attendant to, and the real-world performance of, the Affected Vehicles and Tesla's Enhanced Autopilot AP2.0 system, Plaintiffs and fellow putative California class members who purchased or leased the Affected Vehicles would have

1   paid less for their vehicles and the Enhanced Autopilot AP2.0 system, or they would not have

2   purchased or leased them at all.

3        207.    Accordingly, Tesla is liable to Plaintiffs and the proposed California class for

4   damages in an amount to be proven at trial.

5        208.    Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud,

6   and in reckless disregard of Plaintiffs' and the California class members' rights and well-being, and

7   as part of efforts to enrich itself at the expense of consumers and others on California roads.  Tesla's

8   conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in

9   the future, which amount is to be determined according to proof.

10  **B.    Colorado**

11                              **COUNT I**

12      **VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
        **(COLO. REV. STAT. § 6-1-101, *ET SEQ.*)**

13       209.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

14  herein.

15       210.    Plaintiff Dean Sheikh brings this Count on behalf of himself and the alternative

16  Colorado Class and Colorado Enhanced Autopilot Subclass ("Colorado class").

17       211.    Tesla is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act

18  ("Colorado CPA"), COLO. REV. STAT. § 6-1-101, *et seq.*

19       212.    Plaintiff and Colorado class members are "consumers" for purposes of COLO. REV.

20  STAT. § 6-1-113(1)(a) who purchased or leased one or more Affected Vehicles.

21       213.    The Colorado CPA prohibits deceptive trade practices in the course of a person's

22  business.  Tesla engaged in deceptive trade practices prohibited by the Colorado CPA, including:

23  (1) knowingly making a false representation as to the characteristics, uses, and benefits of the

24  Affected Vehicles that had the capacity or tendency to deceive Colorado Class members;

25  (2) representing that the Affected Vehicles are of a particular standard, quality, and grade even

26  though Tesla  knew or should have known they are not; (3) advertising the Affected Vehicles with

27  the intent not to sell them as advertised; and (4) failing to disclose material information concerning

28

the Affected Vehicles that was known to Tesla at the time of advertisement or sale with the intent to induce Colorado Class members to purchase, lease, or retain the Affected Vehicles.

214.    In the course of business, Tesla willfully failed to disclose and actively concealed the defects in the AP2.0 system discussed herein, and it otherwise engaged in activities with a tendency or capacity to deceive. Tesla also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Affected Vehicles.

215.    Tesla knew that it had designed and installed a defective AP2.0 system and knew that the system would not be ready as advertised. Tesla knew this information but concealed all of it.

216.    Tesla was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and that jeopardized the safety of the vehicles' occupants. Tesla concealed this information as well.

217.    By failing to disclose that the AP2.0 system was defective, by marketing Tesla vehicles as safe, reliable, and of high quality, and by presenting Tesla as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Tesla engaged in deceptive business practices in violation of the Colorado CPA.

218.    Tesla's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the AP2.0 system and when it would be fully and safely functional, the quality of the Tesla brand, the devaluing of safety and performance at Tesla, and the true value of the Affected Vehicles.

219.    Tesla intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Colorado class.

220.    Tesla knew or should have known that its conduct violated the Colorado CPA.

221.    As alleged above, Tesla made material statements about the safety and performance of the Affected Vehicles and the Tesla brand that were either false or misleading.

222.    Tesla owed Plaintiff and the Colorado class a duty to disclose the true safety, performance, and reliability of the Affected Vehicles, and the devaluing of safety and performance at Tesla, because Tesla:

a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.    Made incomplete representations about the safety and performance of the Affected Vehicles generally, and the defective AP2.0 system in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

223.    Because Tesla fraudulently concealed the defective nature of the AP2.0 system and the true performance of its vehicles bearing the AP2.0 system, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has diminished.  In light of the stigma attached to those vehicles by Tesla's conduct, they are now worth significantly less than they otherwise would be.

224.    Tesla's fraudulent sales and deployment of the defective AP2.0 system and the true performance of Tesla vehicles equipped with this system were material to Plaintiff and the Colorado class.  A vehicle made by a reputable manufacturer of safe, high-performing electric vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe electric vehicles that conceals defects rather than promptly remedying them.

225.    Plaintiff and the Colorado class suffered ascertainable loss caused by Tesla's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Tesla's violations of the Colorado CPA.

226.    Tesla had an ongoing duty to all Tesla customers to refrain from unfair and deceptive practices under the Colorado CPA.  All owners of Affected Vehicles suffered ascertainable loss in

1    the form of the diminished value of their vehicles as a result of Tesla's deceptive and unfair acts and

2    practices made in the course of Tesla's business.

3    227.    Tesla's violations present a continuing risk to Plaintiff and the Colorado class as well

4    as to the general public.  Tesla's unlawful acts and practices complained of herein affect the public

5    interest.

6    228.    As a direct and proximate result of Tesla's violations of the Colorado CPA, Plaintiff

7    and the Colorado class have suffered injury-in-fact and/or actual damage.

8    229.    Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiff, individually and on behalf of the

9    Colorado class, seeks monetary relief against Tesla measured as the greater of (a) actual damages in

10   an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory

11   damages in the amount of $500 for himself and each Colorado class member.

12   230.    Plaintiff also seeks an order enjoining Tesla's unfair and/or deceptive acts or

13   practices, punitive damages, and attorneys' fees, and any other just and proper relief available under

14   the Colorado CPA.

## COUNT II

## FRAUD BY CONCEALMENT

17   231.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

18   herein.

19   232.    Plaintiff Sheikh brings this Count on behalf of himself and the Colorado class.

20   233.    Tesla concealed and suppressed material facts concerning the quality of Tesla

21   vehicles and the Tesla brand.

22   234.    Tesla concealed and suppressed material facts concerning the safety, performance,

23   and quality of the Affected Vehicles.  As alleged in this Complaint, notwithstanding their promises

24   as to the readiness and capabilities of the AP2.0 system, Tesla knowingly and intentionally designed

25   and incorporated a system that would not permit safe operation of the vehicle.

26   235.    Tesla did so in order to boost confidence in its vehicles and falsely assure purchasers

27   and lessees of Tesla vehicles that Tesla is a reputable manufacturer that stands behind its vehicles

28   after they are sold, and that its vehicles are safe, reliable, and perform as promised.  The false

representations were material to consumers, both because they concerned the safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

236.    Plaintiff and Colorado class members viewed advertising on Tesla's website and elsewhere that touted the features and availability of the AP2.0 system.  They had no way of knowing that Tesla's representations were false and gravely misleading.  Plaintiff and Colorado class members did not and could not unravel Tesla's deception on their own.

237.    Tesla had a duty to disclose the true performance of Tesla vehicles equipped with an AP2.0 system because knowledge of the scheme and its details were known and/or accessible only to Tesla; Tesla had superior knowledge and access to the facts; and Tesla knew the facts were not known to, or reasonably discoverable, by Plaintiff and the Colorado class.  Tesla also had a duty to disclose because it made many general affirmative representations about the about the qualities of its vehicles equipped with the AP2.0 system, starting with references to them as vehicles with *auto-pilot* capabilities, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of its vehicles, its actual decision to put sales and profits over safety, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff, Tesla had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the safety and the value of the Affected Vehicles purchased or leased by Plaintiff and the Colorado class.  Whether a vehicle is safe to drive, and whether that vehicle's manufacturer tells the truth with respect to the vehicle's capabilities, performance, and safety are material concerns to a consumer, as evidenced by the approximately $5,000 premium paid for the Teslas equipped with an AP2.0 system.

238.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not perform as other premium vehicles on the market, including as to safety features of these vehicles, which perception would hurt the brand's image and cost Tesla money, and it did so at the expense of Plaintiff and the Colorado class.

239.    On information and belief, Tesla has still not made full and adequate disclosures and continues to defraud Plaintiff and the Colorado class by concealing material information regarding the safety and performance of its vehicles.

240.    Plaintiff and the Colorado class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the AP2.0-equipped vehicles manufactured by Tesla, and/or would not have continued to drive their Affected Vehicles or would have taken other affirmative steps.  Plaintiff's and the Colorado class members' actions were justified.  Tesla was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Colorado class.

241.    Because of the concealment and/or suppression of the facts, Plaintiff and the Colorado class sustained damage because they did not receive the Standard Safety Features that Tesla promised as included in the purchase price of their vehicle and they did not receive value for the approximately $5,000 premium paid, and they own vehicles that diminished in value as a result of Tesla's concealment of, and failure to timely disclose, the actual safety and performance of Tesla vehicles with AP2.0 systems.  Had they been aware of the true safety and performance of the Affected Vehicles, Plaintiff and Colorado class members who purchased or leased the Affected Vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

242.    The value of all Colorado class members' Affected Vehicles has diminished as a result of Tesla's fraudulent concealment of the true capabilities of the AP2.0 system, which has greatly tarnished the Tesla brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Colorado class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proven at trial.

243.    Accordingly, Tesla is liable to the Colorado class for damages in an amount to be proven at trial.

244.    Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Colorado class members' rights and well-being to

1    enrich Tesla.  Tesla's conduct warrants an assessment of punitive damages in an amount sufficient to

2    deter such conduct in the future, which amount is to be determined according to proof.

3    **COUNT III**

4    **UNJUST ENRICHMENT**

5    245.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

6    herein.

7    246.    In the event that no adequate legal remedy is available, Plaintiff Sheikh brings this

8    Count in the alternative on behalf of himself and the Colorado class.

9    247.    Tesla has received and retained a benefit from Plaintiff and the Colorado class and

10    inequity has resulted.

11    248.    Tesla has benefitted from selling and leasing defective cars whose value was

12    artificially inflated by Tesla's concealment of the defective AP2.0 system at a profit, and Plaintiff

13    and the Colorado class have overpaid for the cars and been forced to pay other costs.

14    249.    Thus, all Colorado class members conferred a benefit on Tesla.

15    250.    It is inequitable for Tesla to retain these benefits.

16    251.    Plaintiff and the Colorado class were not aware of the true facts about the Affected

17    Vehicles and did not benefit from Tesla's conduct.

18    252.    Tesla knowingly accepted the benefits of its unjust conduct.

19    253.    As a result of Tesla's conduct, the amount of its unjust enrichment should be

20    disgorged, in an amount according to proof.

21    **C.    Florida**

22    **COUNT I**

23    **VIOLATION OF FLORIDA'S UNFAIR &**
**DECEPTIVE TRADE PRACTICES ACT**
24    **(FLA. STAT. § 501.201, *ET SEQ.*)**

25    254.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

26    herein.

27    255.    Plaintiff John Kelner brings this Count on behalf of himself and the alternative

28    Florida Class and Florida Enhanced Autopilot Subclass ("Florida class").

256.    Plaintiff and Florida class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

257.    Tesla engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

258.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

259.    In the course of business, Tesla willfully failed to disclose and actively concealed the defective AP2.0 system discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  Tesla also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Affected Vehicles.

260.    Tesla knew it had designed and installed a defective AP2.0 system and knew that the system did not work as advertised.  Tesla also knew that it could not meet its delivery timeline, but it concealed all of that information.

261.    Tesla was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicles' occupants.  Tesla concealed this information as well.

262.    By failing to disclose that defects in the AP2.0 system, by misrepresenting its delivery date, by marketing Tesla vehicles as safe, reliable, and of high quality, and by presenting Tesla as a reputable manufacturer that valued safety and stood behind their vehicles after they were sold, Tesla engaged in deceptive business practices in violation of the FUDTPA.

263.    Tesla's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Florida class members, about the true performance of Tesla vehicles equipped with AP2.0 systems, the quality of the Tesla brand, the devaluing of safety and performance at Tesla, and the true value of the Affected Vehicles.

264.     Tesla intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Florida class.

265.     Tesla knew or should have known that its conduct violated the FUDTPA.

266.     As alleged above, Tesla made material statements about the safety and performance of the Affected Vehicles and the Tesla brand that were either false or misleading.

267.     Tesla owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Affected Vehicles, and the devaluing of safety and performance at Tesla, because Tesla:

    a.    Possessed exclusive knowledge that they valued profits and cost-cutting over safety and performance, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiff and the Florida class; and/or

    c.    Made incomplete representations about the safety and performance of the Affected Vehicles generally, and the defective AP2.0 system in particular, while purposefully withholding material facts from Plaintiff and the Florida class that contradicted these representations.

268.     Because Tesla fraudulently concealed defects in its AP2.0 system (as well as its anticipated delivery date) and the true performance of Tesla vehicles equipped with AP2.0 systems, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by Tesla's conduct, they are now worth significantly less than they otherwise would be.

269.     Tesla's fraudulent use of the defective AP2.0 system and the true performance of Tesla vehicles equipped with this system were material to Plaintiff and the Florida class.  A vehicle made by a reputable manufacturer of safe, high-performing electric vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe electric vehicles that conceals defects rather than promptly remedying them.

270.     Plaintiff and the Florida class suffered ascertainable loss caused by Tesla's misrepresentations and their concealment of and failure to disclose material information.  Class

members who purchased the Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Tesla's violations of the FUDTPA.

271.    Tesla had an ongoing duty to all Tesla customers to refrain from unfair and deceptive practices under the FUDTPA.  All owners of Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Tesla's deceptive and unfair acts and practices made in the course of Tesla's business.

272.    Tesla's violations present a continuing risk to Plaintiff and the Florida class as well as to the general public.  Tesla's unlawful acts and practices complained of herein affect the public interest.

273.    As a direct and proximate result of Tesla's violations of the FUDTPA, Plaintiff and the Florida class have suffered injury-in-fact and/or actual damage.

274.    Plaintiff and the Florida class are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

275.    Plaintiff also seeks an order enjoining Tesla's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT II

## FRAUD BY CONCEALMENT

276.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

277.    Plaintiff Kelner brings this Count on behalf of himself and the Florida class.

278.    Tesla concealed and suppressed material facts concerning the quality of its vehicles and the Tesla brand.

279.    Tesla concealed and suppressed material facts concerning the safety, performance, and quality of the Affected Vehicles.  As alleged in this Complaint, notwithstanding its promises as to capabilities of the AP2.0 system and its anticipated delivery date, Tesla knowingly and intentionally designed and incorporated a system that would undermine safe operation of its vehicles.

280.    Tesla did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Tesla vehicles that Tesla is a reputable manufacturer that stands behind its vehicles after they are sold, and that its vehicles are safe, reliable, and perform as promised.  The false representations were material to consumers, both because they concerned the safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

281.    Plaintiff and Florida class members viewed advertising on Tesla's website and other forums that promised extensive auto-pilot and safety features.  They had no way of knowing that Tesla's representations were false and gravely misleading.  Plaintiff and Florida class members did not and could not unravel Tesla's deception on their own.

282.    Tesla had a duty to disclose the true performance of the Affected Vehicles because knowledge of the scheme and its details were known and/or accessible only to Tesla; Tesla had superior knowledge and access to the facts; and Tesla knew the facts were not known to, or reasonably discoverable, by Plaintiff and the Florida class.  Tesla also had a duty to disclose because it made many general affirmative representations about the about the qualities of vehicles equipped with the AP2.0 system, starting with references to them as vehicles with an *auto-pilot* system, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of its vehicles, its actual decision to put sales and profits over safety, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff, Tesla had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the safety and the value of the Affected Vehicles purchased or leased by Plaintiff and the Florida class.  Whether a vehicle is safe to drive, and whether that vehicle's manufacturer tells the truth with respect to the vehicles performance and capabilities are material concerns to a consumer, as evidenced by the approximately $5,000 premium paid for Tesla vehicles equipped with the AP2.0 system.

283.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not perform as

other premium vehicles on the market, which perception would hurt the brand's image and cost Tesla money, and it did so at the expense of Plaintiff and the Florida class.

284.     On information and belief, Tesla has still not made full and adequate disclosures and continues to defraud Plaintiff and the Florida class by concealing material information regarding the safety and performance of its vehicles.

285.     Plaintiff and the Florida class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the AP2.0 system-equipped vehicles manufactured by Tesla, and/or would not have continued to drive their Affected Vehicles or would have taken other affirmative steps. Plaintiff's and the Florida class members' actions were justified.  Tesla was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Florida class.

286.     Because of the concealment and/or suppression of the facts, Plaintiff and the Florida class sustained damage because they did not receive the value for the approximately $5,000 premium paid, and they own vehicles that diminished in value as a result of Tesla's concealment of, and failure to timely disclose, the actual safety and performance of Tesla vehicles with the AP2.0 system.  Had they been aware of the true safety and performance of the Affected Vehicles, Plaintiff and Florida class members who purchased or leased the Affected Vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

287.     The value of all Florida class members' Affected Vehicles has diminished as a result of Tesla's fraudulent concealment of the true capabilities of the AP2.0 system, which has greatly tarnished the Tesla brand and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Florida class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proven at trial.

288.     Accordingly, Tesla is liable to Plaintiff and the Florida class for damages in an amount to be proven at trial.

289.     Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Florida class members' rights and well-being, to

enrich Tesla.  Tesla's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**

**UNJUST ENRICHMENT**

290.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

291.  In the event that no adequate legal remedy is available, Plaintiff Kelner brings this Count in the alternative on behalf of himself and the Florida class.

292.  Tesla has received and retained a benefit from Plaintiff, and inequity has resulted.

293.  Tesla has benefitted from selling and leasing defective cars whose value was artificially inflated by Tesla's concealment of the defective AP2.0 system at a profit, and Plaintiff and the Florida class have overpaid for the cars and been forced to pay other costs.

294.  Thus, all Florida class members conferred a benefit on Tesla.

295.  It is inequitable for Tesla to retain these benefits.

296.  Plaintiff and the Florida class were not aware of the true facts about the Affected Vehicles and did not benefit from Tesla's conduct.

297.  Tesla knowingly accepted the benefits of its unjust conduct.

298.  As a result of Tesla's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**D.    New Jersey**

**COUNT I**

**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)**

299.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

300.  Plaintiffs Tom Milone and Daury Lamarche bring this action on behalf of themselves and the alternative New Jersey Class and New Jersey Enhanced Autopilot Subclass ("New Jersey class") against Tesla.

301. Plaintiffs, the New Jersey class members, and Tesla are persons under the New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1(d).

302. Tesla engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (e). Tesla's actions as set forth herein occurred in the conduct of trade or commerce.

303. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

304. In the course of Tesla's business, Tesla intentionally or negligently concealed and suppressed material facts concerning the capabilities and anticipated delivery date of its AP2.0 system. Tesla accomplished this by designing and installing defective software in the Affected Vehicles and misrepresenting the delivery date for safe, functional software. Defects in the software package actually render Affected Vehicles unsafe to drive, as set forth herein. The result was what Tesla intended—consumers gave it their hard-earned money for a system that did not work, and that would not be delivered consistent with its representations. Plaintiffs and New Jersey class members had no way of discerning that Tesla's representations were false and misleading because Tesla's AP2.0 system was extremely sophisticated technology and because they had no way of knowing when it actually would be ready for real-world use. Plaintiffs and New Jersey class members did not and could not unravel Tesla's deception on their own.

305. Tesla thus violated the provisions of the New Jersey CFA, at a minimum by: (1) representing that the Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Affected Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Affected Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Affected Vehicles with the intent to

induce consumers to purchase or lease the Affected Vehicles; and (5) otherwise engaging in conduct likely to deceive.

306.    Tesla engaged in misleading, false, unfair, or deceptive acts or practices that violated the New Jersey CFA by installing, failing to disclose and/or actively concealing defects in its AP2.0 system; by misrepresenting the date by which this system would be ready for safe, real-world deployment; by marketing its vehicles as safe, reliable, and of high quality; and by presenting itself as a reputable manufacturer that valued safety and that stood behind its vehicles after they were sold.

307.    Tesla compounded the deception by repeatedly asserting that the Affected Vehicles were safe and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

308.    By violating federal laws, including the Motor Vehicle Safety Act and attendant regulations, and by failing to recall vehicles that contain a safety defect, Tesla violated federal law and therefore engaged in conduct that violates the New Jersey CFA.

309.    Tesla knew it had designed and installed a defective AP2.0 system in the Affected Vehicles, and it knew it could not deliver a safe AP2.0 system with the capabilities it touted, but it concealed all of that information.  Tesla also knew that it valued profits over safety and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that violated federal law, but it concealed this information as well.

310.    Tesla intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the New Jersey class.

311.    Tesla knew or should have known that its conduct violated the New Jersey CPA.

312.    Defendant owed Plaintiffs and New Jersey class members a duty to disclose, truthfully, all the facts concerning the AP2.0 system and vehicles equipped with it because it:

      a.      Possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with federal law;

      b.      Intentionally concealed the foregoing from regulators, Plaintiffs, New Jersey class members; and/or

c.   Made incomplete or negligent representations about the safety and capabilities of the Affected Vehicles, as well as the date by which a safe and capable AP2.0 system would actually be delivered, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

313.   Tesla fraudulently concealed the defects in the AP2.0 system and the true safety and performance of Affected Vehicles, resulting in a raft of negative publicity once Tesla's fraud was exposed.  The value of the Affected Vehicles has therefore plummeted.  In light of the stigma Tesla's misconduct attached to the Affected Vehicles, the Affected Vehicles are now worth less than they otherwise would be worth.

314.   Tesla's fraudulent behavior regarding the AP2.0 system and its concealment of the true relevant facts as described herein were material to Plaintiffs and the New Jersey class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

315.   Tesla's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and New Jersey class members, about the true safety and capabilities of Tesla-branded vehicles equipped with the AP2.0 system, the quality of the Tesla brand, and integrity at Tesla, and the true value of the Affected Vehicles.

316.   Plaintiffs and New Jersey class members suffered ascertainable loss and actual damages as a direct and proximate result of Tesla's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the New Jersey class members who purchased or leased the Affected Vehicles would not have purchased or leased them at all and/or—if the vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. Plaintiffs and members of the putative New Jersey class also suffered diminished value of their vehicles, as well as lost or diminished use.

317.   Tesla had an ongoing duty to all Tesla customers to refrain from unfair and deceptive practices under the New Jersey CFA in the course of its business.

318.     Tesla's violations present a continuing risk to Plaintiffs as well as to the New Jersey class and general public.  Tesla's unlawful acts and practices complained of herein affect the public interest.

319.     As a result of the foregoing wrongful conduct of Tesla, Plaintiffs and the New Jersey class have been damaged in an amount to be proven at trial, and they seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendant's deceptive and unfair conduct, costs, and reasonable attorneys' fees under N.J. STAT. ANN. § 56:8-19, and all other just and appropriate relief.

**COUNT II**

**FRAUD BY CONCEALMENT**

320.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

321.     Plaintiffs Tom Milone and Daury Lamarche bring this action on behalf of themselves and the alternative New Jersey Class and New Jersey Enhanced Autopilot Subclass ("New Jersey class") against Tesla.

322.     Tesla concealed and suppressed material facts concerning the quality of its vehicles and the Tesla brand.

323.     More specifically, Tesla concealed and suppressed material facts concerning the design, safety, performance, and quality of the Affected Vehicles, the Standard Safety Features, and its Enhanced Autopilot AP2.0 system.  As alleged in this complaint, notwithstanding its promises regarding Standard Safety Features and its Enhanced Autopilot AP2.0 system, Tesla knowingly and intentionally designed and incorporated Standard Safety Features that simply did not exist at the time of purchase and delivery of Affected Vehicles and do not presently exist.  In addition, Tesla sold and installed in Affected Vehicles an Enhanced Autopilot AP2.0 system that it knew was unsafe to use and would impair the safe operation of the vehicle.

324.     Tesla did so in order to boost sales of its vehicles and in order to falsely assure purchasers and lessees of Tesla vehicles that Tesla is a reputable manufacturer and that Tesla's vehicles and self-driving system are safe, reliable, and able to perform as promised.  The false

representations were material to consumers, both because they concerned the safety of the Affected Vehicles and because the representations played a significant role in the value of the vehicles.

325.    Plaintiffs and proposed New Jersey class members viewed advertising on Tesla's website, read promotional materials, and heard Tesla dealer sales pitches that promised Standard Safety Features comparable to those in other similarly priced luxury vehicles and safe Enhanced Autopilot capabilities if they also purchased Tesla's expensive Enhanced Autopilot AP2.0.  They had no way of knowing that Tesla's representations were false and gravely misleading.  Plaintiffs and New Jersey class members did not and could not unravel Tesla's deception on their own.

326.    Tesla had a duty to disclose the true safety features and performance of its Affected Vehicles, and the Enhanced Autopilot AP2.0 system, because knowledge of the scheme and its details were known and/or accessible only to Tesla; Tesla had superior knowledge and access to the facts; and Tesla knew the facts were not known to, or reasonably discoverable by, Plaintiffs and members of the putative New Jersey class.  Tesla also had a duty to disclose because it made many general affirmative representations about the about the safety and qualities of Affected Vehicles and the Enhanced Autopilot AP2.0 system, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of: (a) the additional facts set forth above regarding the actual performance of these vehicles and Enhanced Autopilot AP2.0 software; (b) its actual decision to put sales and profits over safety; and (c) its actual practices with respect to the vehicles and system at issue.  Having volunteered to provide information to Plaintiffs and the proposed New Jersey class, Tesla had the duty to disclose not merely the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the safety and the value of the Affected Vehicles purchased or leased by Plaintiffs and the New Jersey Class.  Whether a vehicle is safe to drive, and whether that vehicle's manufacturer tells the truth with respect to the vehicle's real abilities, are material concerns to a consumer, as evidenced by the exorbitant base prices of Affected Vehicles ($72,000–$135,000+) and $5,000 premium paid for Tesla vehicles equipped with the Enhanced Autopilot AP2.0 system.

327.    Tesla actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to burnish the perception that its vehicles were at the leading edge of

safety and autopilot technology, which perception would enhance the brand's image and garner Tesla more money. But it did so at the expense of Plaintiffs and the New Jersey class.

328. On information and belief, Tesla still has not made full and adequate disclosures and continues to defraud Plaintiffs and the New Jersey class by concealing material information regarding the safety and performance of Affected Vehicles and the Enhanced Autopilot AP2.0 system.

329. Plaintiffs and the New Jersey class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased Affected Vehicles manufactured by Tesla, would not have paid the $5,000 premium for Enhanced Autopilot AP2.0, and/or would not have continued to drive their Affected Vehicles or would have taken other affirmative steps. Plaintiffs' and the New Jersey class members' actions were justified. Tesla was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or the New Jersey class.

330. Because of the concealment and/or suppression of the facts, Plaintiffs and the New Jersey class sustained damage because they did not receive the value for: (1) the base purchase price of their Affected Vehicles, which were supposed to have been equipped with functional Standard Safety Features by December 2016, but were not so equipped; and (2) the $5,000 premium paid for Enhanced Autopilot functionality when that functionality was not available as promised in December 2016, and, even if operable, remains unsafe and unreliable to this day. Had Plaintiffs and members of the New Jersey class been aware of the grave safety issues attendant to, and the real-world performance of, the Affected Vehicles and Tesla's Enhanced Autopilot AP2.0 system, Plaintiffs and fellow putative New Jersey class members who purchased or leased the Affected Vehicles would have paid less for their vehicles and the Enhanced Autopilot AP2.0 system, or they would not have purchased or leased them at all.

331. Accordingly, Tesla is liable to Plaintiffs and the proposed New Jersey class for damages in an amount to be proven at trial.

332. Tesla's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the New Jersey class members' rights and well-being, and

1   as part of efforts to enrich itself at the expense of consumers and others on New Jersey roads.

2   Tesla's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

3   conduct in the future, which amount is to be determined according to proof.

4   **COUNT III**

5   **UNJUST ENRICHMENT**

6   333.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth

7   herein.

8   334.    In the event that no adequate legal remedy is available, Plaintiffs Lamarche and

9   Milone bring this Count in the alternative on behalf of themselves and the New Jersey class.

10   335.    Tesla has received and retained a benefit from Plaintiffs, and inequity has resulted.

11   336.    Tesla has benefitted from selling and leasing defective cars whose value was

12   artificially inflated by Tesla's concealment of the defective AP2.0 system at a profit, and Plaintiffs

13   and the New Jersey class have overpaid for the cars and been forced to pay other costs.

14   337.    Thus, all New Jersey class members conferred a benefit on Tesla.

15   338.    It is inequitable for Tesla to retain these benefits.

16   339.    Plaintiffs and the New Jersey class were not aware of the true facts about the Affected

17   Vehicles and did not benefit from Tesla's conduct.

18   340.    Tesla knowingly accepted the benefits of its unjust conduct.

19   341.    As a result of Tesla's conduct, the amount of its unjust enrichment should be

20   disgorged, in an amount according to proof.

21   **REQUEST FOR RELIEF**

22   WHEREFORE, Plaintiffs, individually and on behalf of members of the proposed classes,

23   respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

24   A.    Certification of the proposed nationwide class and subclass, or, alternatively, the

25   proposed state classes and subclasses, including appointment of Plaintiffs' counsel as class counsel;

26   B.    An order temporarily and permanently enjoining Tesla from continuing the unlawful,

27   deceptive, fraudulent, and unfair business practices alleged in this complaint;

28   C.    Injunctive relief in the form of a recall;

1   D.  Equitable relief in the form of buyback of the Affected Vehicles;

2   E.  Costs, restitution, damages, including punitive damages, penalties, and disgorgement

3 in an amount to be determined at trial;

4   F.  An order requiring Tesla to pay both pre- and post-judgment interest on any amounts

5 awarded;

6   G.  An award of costs and attorneys' fees; and

7   H.  Such other or further relief as may be appropriate.

8         **DEMAND FOR JURY TRIAL**

9   Plaintiffs hereby demand a jury trial for all claims so triable.

10

11 Dated:  July 14, 2017     HAGENS BERMAN SOBOL SHAPIRO LLP

12         By */s/ Steve W. Berman*
          Steve W. Berman (*pro hac vice*)

13         Thomas E. Loeser (SBN 202724)
          Robert F. Lopez, (*pro hac vice*)

14         1918 Eighth Avenue, Suite 3300
          Seattle, Washington  98101

15         Telephone: (206) 623-7292
          Facsimile: (206) 623-0594

16         Email: steve@hbsslaw.com
          Email: toml@hbsslaw.com

17         Email: robl@hbsslaw.com

18         Shana E. Scarlett (SBN 217895)
          715 Hearst Avenue, Suite 202

19         Berkeley, California  94710
          Telephone:  (510) 725-3000

20         Facsimile:  (510) 725-3001
          Email: shanas@hbsslaw.com

21         *Attorneys for Plaintiffs and the Proposed Classes*

22

23

24

25

26

27

28